## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

HARRIET TUBMAN FREEDOM
FIGHTERS, CORP., and HEAD
COUNT, INC.

*Plaintiffs*,

v.

LAUREL LEE, in her official capacity
as Secretary of State of Florida, and
ASHLEY MOODY, in her official
Capacity as Florida Attorney General,

*Defendants*.

**COMPLAINT**

Civil Action No. _____

Plaintiffs Harriett Tubman Freedom Fighters, Corp. and Head Count, Inc. (collectively, "Plaintiffs"), bring this action against Laurel Lee, in her official capacity as Secretary of the State of Florida, and Ashley Moody, in her official capacity as Attorney General of the State of Florida, (collectively, "Defendants"), and allege the following:

### INTRODUCTION

1.     This lawsuit challenges Florida's attempt to compel Plaintiff civic organizations to convey a government message which undermines the organizations' own private speech and associational activity by compelling these speakers to

denigrate their own efforts to promote political association and participation, in violation of the First and Fourteenth Amendments.

2.      The right to vote is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). Moreover, "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections." H.R. Rep. 103-9 (1993). Such registration laws "disproportionately harm voter participation by various groups, including the disabled and racial minorities." *Id.*

3.      Plaintiffs' voter registration efforts are "core political speech" involving "interactive communication concerning political change." *Meyer v. Grant*, 486 U.S. 414, 422 (1988). Plaintiffs' endeavors to assist others in registering to vote are themselves political and philosophical statements, signaling that they value the democratic process and believe in the capacity of the popular will to shape the composition and direction of the government.

4.      Governor Ron DeSantis signed Senate Bill 90 into law ("SB 90") on May 6, 2021. Section 7 of SB 90 modified Florida Statute Section 97.0575, pertaining to third-party voter registration organizations ("3PVROs"). The modified statute now requires 3PVROs to warn voter registration applicants, at the point where the applicant entrusts their application to the organization, that they may not

timely submit applicants' registration applications and to inform them "how to register online with the [state] division [of elections]."

5.      This inaccurate "warning" ignores that Plaintiffs make and/or will make every effort to timely submit registration applications in furtherance of their missions and  compels them and other non-governmental organizations, their staff, and their volunteers who assist Floridians to register to vote to issue a self-denigrating, misleading, and contradictory warning to a voter registration applicant when they accept an application for the purpose of submitting it to election officials on the applicant's behalf.

6.      In so doing, SB 90 obstructs Plaintiffs' efforts to associate with potential voters. SB 90 also interferes with voters' opportunity to register, impedes Plaintiffs' participatory messages and missions, interferes with Plaintiff organizations and their associated individuals' constitutionally protected, core political speech. Furthermore, SB 90 forces Plaintiffs to adhere to new requirements and implement operational changes that will render their voter registration activities more costly and resource-intensive and less effective.

7.      Encouraging volunteers to participate in voter registration activity is also an important part of the Plaintiffs' associational activity and their organizational missions. By providing Florida citizens with the opportunity to register to vote,

Plaintiffs build trusted relationships with the applicants as they work to expand their volunteer network and a community of engaged and active voters.

8.     By mandating that Plaintiffs issue this misleading warning and instructions for other voter registration avenues, SB 90 inserts Florida's government into the middle of that private, trusted relationship—in which the organization is a fiduciary—between a potential voter and registration agents.  This interference frustrates Plaintiffs' ability to foster that trust and hampers their voter registration efforts, communications with potential voters, and ability to associate with potential voters.

9.     Unless the challenged disclaimer and disclosure of provisions of SB 90 are enjoined, Plaintiffs' constitutionally protected First Amendment speech and activity will continue to be co-opted by the government. Plaintiffs, as well as many other individuals and groups, will be forced to mislead voter registration applicants as to their own efforts, denigrating their own associational activity integral to advancing their missions and beliefs. By making Plaintiffs less effective at communicating their message, the public will have fewer options to register to vote, and fewer opportunities to associate with Plaintiffs in meaningful civic activities.

10.     By co-opting Plaintiffs' First Amendment activities to convey the state of Florida's own onerous, misleading, and irrational message, the challenged

provision of SB 90 does not serve any government interest and cannot survive the exacting scrutiny applied to such restrictions.

11.    SB 90 also fails to put Plaintiffs on adequate notice as to possible penalties they might face for any non-compliance with the law and, thus, creates a chilling effect on Plaintiffs' voter registration and associated civic engagement activities in violation of the Fourteenth Amendment.

12.    Plaintiffs seek a declaratory judgment that the challenged provisions of Fla. Stat. § 97.0575 are unconstitutional, and an injunction prohibiting Defendants from enforcing them, thereby permitting Plaintiffs' constitutionally protected, community-based voter registration speech and activities to continue without such unlawful interference.

## **JURISDICTION AND VENUE**

13.    This action is brought under the United States Constitution. The Court, therefore, has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1331, 1343, 1357, and 42 U.S.C. §§ 1983 and 1988. It also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, to grant the declaratory relief requested.

14.    This Court has personal jurisdiction over each Defendant because each is a citizen of Florida and their principal places of business are in Tallahassee, Florida.

15.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because Defendants conduct business in this District and all Defendants reside in Florida, and because a substantial portion of the events giving rise to these claims occurred in the Northern District of Florida.

## PARTIES

### Harriet Tubman Freedom Fighters, Corp.

16.     Plaintiff Harriet Tubman Freedom Fighters, Corp. ("HTFF") is a Florida 501(c)(3) non-profit corporation with a principal place of business, office, and registered agent in Jacksonville, Florida.

17.     HTFF was incorporated in October 2020 by a formerly incarcerated Black woman and voting rights activist, Rosemary McCoy ("McCoy").

18.     McCoy and HTFF's Secretary, Sheila Singleton, have been passionate and tireless advocates in the Florida voting rights space for several years: they participated in collecting enough signatures to put the Voting Rights Restoration Amendment ("Amendment 4"), restoring voting rights to citizens disenfranchised in Florida due to prior felony convictions, on the ballot in 2018; they helped voters to register and Get-Out-the-Vote to ensure that Amendment 4 passed in 2018; and, when Florida's legislature enacted SB 7066 (which prevents returning citizens from registering to vote if they are unable to pay all fines, court costs, and restitution associated with their sentences), they became plaintiffs in a lawsuit challenging it.

19.     Recognizing that their voting rights work is bigger than themselves and identifying a need for an organization to specifically reach out to potential voters (particularly lower-income, people of color) affected by Florida's criminal justice system who are wary of the electoral process and being further marginalized and criminalized for participating in it, McCoy and Singleton joined with others to found HTFF as a charitable and educational non-profit.

20.     Today, HTFF connects networks of previously disparate volunteers from non-profits across Florida and, along with other Florida voting rights organizations, engages in weekly phone banking, canvassing, and panel discussions to engage citizens and inform them about voting rights issues ranging from federal legislation to municipal school board resolutions.

21.     Now that their officers and coalition partners are fully vaccinated from Covid-19, communities and organizations across Florida regularly solicit HTFF, as a credible organization, to reach marginalized and returning citizen communities that are skeptical of the legitimacy of voter registration efforts and state actors, to help them conduct joint in-person canvassing, speaking engagements, and voter registration efforts[1] across Florida.

---

[1] HTFF submitted an application to register as a 3PVRO to the Florida Division of Elections listing several individuals who will conduct voter registration activities on HTFF's behalf, and is awaiting approval. In the meantime, its members will continue, as they have in the past, to work (as employees or volunteers) with other organizations that are Florida-registered 3PVROs on their voter registration efforts.

22.     HTFF has received grants specifically intended for voter registration, outreach, and mobilization efforts among new voters who are disproportionately voters of color, young people, Floridians with past felony convictions, lower-income individuals, and other marginalized groups.

23.     The communities HTFF serves are statistically less likely to register to vote, less likely to have the necessary identification and resources to enable them to register using Florida's online system, and more likely to rely on trusted non-state actors in their community with whom they identify for assistance and information in navigating the voter registration process.

24.     To inaugurate their 2021 voting rights efforts and commemorate Juneteenth, HTFF plans to participate in a June 19, 2021 event where they will have a HTFF-branded table and work with a registered 3PVRO to provide people with voter registration information and information about upcoming elections and ballot initiatives.

25.     SB 90's requirements regarding the additional, unnecessary, and vague information HTFF must provide potential voters unlawfully compels them to engage in false speech, undermines the credibility they have established in the communities

in which they work, and fails to provide them with proper notice as to the penalties for any alleged violations of the law.

26.     Delivering SB 90's disclaimer and disclosures also will require that HTFF divert time and resources to train its staff and volunteers to comply with SB 90, lengthen HTFFs interactions with each prospective registered voter (thereby making it harder to reach the same number of prospective voters in the same amount of time), and will necessitate HTFF diverting time and resources away from its other activities for SB 90-specific trainings and voter registration requirements.

## Head Count, Inc.

27.     Head Count, Inc. ("HeadCount") is a national 501(c)(3) non-profit, non-partisan organization with a small full-time staff based in New York City. HeadCount's mission is to work with musicians and other popular influencers to promote participation in democracy, including through their voter registration efforts. To that end, HeadCount conducts voter registration activities at concerts and music festivals nationwide and runs programs that connect the popularity and power of music with action. By reaching young people and music fans where they already are—at concerts and online—HeadCount makes civic participation accessible and compelling. HeadCount's organizational message is that people must speak to be heard.

28.    HeadCount has assisted over one million voter registration applicants nationwide since its founding, with nearly three hundred thousand applicants registering through their field programs. The organization has built a network of approximately forty-five thousand volunteers nationwide and has conducted more than six thousand in-person field events nationally since 2004, including hundreds in Florida since 2012 alone.[2] During these field events, HeadCount collects voter registration applications and then delivers them to election officials. HeadCount has helped over seven thousand Florida voters register by collecting and delivering their applications through their work in the field since 2012.

29.    HeadCount promotes partnerships between musicians, concert promoters, and volunteers. When artists affiliated with HeadCount play a concert in a major city, HeadCount helps voters register and rallies music fans to participate in democracy and increase their participation and voice in government. These live music events with voter registration facilitated by HeadCount take place all over the country and, during busy times in the election cycle, almost every night of the week. HeadCount also works directly with many festivals, concert venues, and partners to help extend their reach. At every event, HeadCount offers voter registration for residents of 45 states using the federal mail-in voter registration form.

---

[2] Plaintiff HeadCount has been a registered 3PVRO in Florida since June 2012.

30.     HeadCount receives grant money, direct donations, and sponsorships to fund voter registration activities, including registration activities at concerts, festivals, and other events in Florida.

31.     The bulk of HeadCount's work nationally is done by thousands of volunteers. Some volunteers help voters register at concerts by engaging potential voters, assisting them with filling out forms, and collecting their applications for submission to election officials. Other volunteers take on leadership roles in the organization. As part of HeadCount's core mission, the organization builds civic volunteerism focused on young people and others who have not previously engaged in civic engagement work.

32.     HeadCount's voter registration activities in Florida are spearheaded by volunteer team leaders who are dedicated, experienced volunteers for the organization. HeadCount staffs each event with at least one volunteer team leader so that it can maintain the security of voter registration applications in the field to ensure that they are properly collected and delivered to election officials and requires all team leaders to review the organization's Team Leader manual. After review, they receive a video-call field training and a separate training call regarding HeadCount's event management systems.

33.     HeadCount generally requires all volunteers to participate in a one-hour training session before each show, and rare exceptions are only made when a

volunteer has previously taken the training. A significant number of volunteers are first-time volunteers, who are trained when they arrive for the event. Training covers how to engage people to register to vote, ensuring that applicants complete the forms, and emphasizing the importance of turning in all forms to the organization unaltered. Training also includes information about upcoming elections so that volunteers can spread an effective message about participating in elections.

34.     HeadCount's 2021 voter registration work is already underway, including planning for artist partnerships, producing materials, and implementing processes for quality control and application submission.

35.     HeadCount team leaders independently source community events such as street festivals, voter registration drives at schools or colleges, and other community gatherings. While events are generally put into the HeadCount database for volunteer recruitment, volunteers for such events are sometimes independently sourced by volunteer team leaders, with HeadCount providing materials, information, and email templates for events.

36.     HeadCount particularly intends to reach first-time voter registration applicants and transient voters under the age of 35. HeadCount is working on increasing civic engagement outreach on campuses, offering voter registration at shows within campus communities to increase outreach to young people.

37.     If HeadCount is unable to build trusted relationships with Florida voters during its voter registration activities in the state, it would be a significant loss to the organization's core mission, message, and partner relationships.

38.     The disclaimer and disclosure requirements in SB 90 will diminish HeadCount's message because, despite the fact that HeadCount prioritizes processing applications in accordance with each state's turnaround time using state-approved registration forms or federal voter registration forms, the organization will be required to mislead potential voters by indicating that it may not deliver their applications on time. HeadCount believes this disclaimer will groundlessly reduce the faith its registrants have in its voter registration program and in the organization itself.

39.     The disclaimers and disclosures required by SB 90 will make it more difficult for HeadCount to develop relationships with registrants and will make it less likely for event-goers to regularly turn to the organization as a trusted resource when they need assistance with voter registration forms for changes or updates.

40.     SB 90 has already affected HeadCount's registration activities; for example, HeadCount was forced to hold an emergency training for their May 22, 2021 event, an approach which is not sustainable given that hundreds of events can occur simultaneously. HeadCount also is concerned with the difficulty of training its

volunteers and volunteer team leaders and communicating liability where the consequences of noncompliance are unclear.

41.    In addition, HeadCount is being forced to alter its established field volunteer training to cover the Florida-specific provisions. Because of the limited time to train field volunteers, communicating additional material such as the disclaimer requirement leads to reduced impact and effectiveness.

### Defendants

42.    Laurel Lee is the Secretary of State ("Secretary") of the State of Florida and is sued in her official capacity. The Secretary of State is the chief election officer of the state, Fla. Stat. § 97.012(1), and is responsible for implementing, operating, and maintaining a uniform statewide voter registration system. *Id.* § 97.012 (11); *id.* § 98.035(1). Among other things, the Secretary is authorized to "adopt by rule uniform standards for the proper and equitable interpretation and implementation of the requirements of chapters 97 through 102 and 105 of the Florida Election Code," as well as "provide uniform standards for the proper and equitable implementation of the registration laws by administrative rule of the Department of State." *Id.* § 97.012(1)-(2).

43.    The Secretary is also authorized under Florida law to "[b]ring and maintain such actions at law or in equity by mandamus or injunction to enforce the performance of any duties of a county supervisor of elections or any official

performing duties with respect to chapters 97 through 102 and 105 or to enforce compliance with a rule of the Department of State adopted to interpret or implement any of those chapters." *Id.* § 97.012 (14). Complaints of violations may be filed with the Department of State. *Id.* § 97.023(1)(a).

44.     Defendant Ashley Moody is the Attorney General of the State of Florida. If the Secretary of State "reasonably believes that a person has committed a violation of [Section 97.0575], the Secretary may refer the matter to the Attorney General for enforcement. The Attorney General may institute a civil action for a violation of [Section 97.0575] or to prevent a violation of this section." Such an action for relief may include a "permanent or temporary injunction, a restraining order, or any other appropriate order." Fla. Stat. § 97.0575(4).

## **FACTS**

### I.     **Voter Registration in Florida**

45.     Floridians need more, not fewer, voter registration opportunities. According to the U.S. Census Bureau's *Current Population Survey* ("CPS"), approximately 10,495,000 Florida citizens were registered to vote as of November 2020, out of a citizen voting age population of 15,645,000.[3] Therefore, as of

---

[3] U.S. Census Bureau, Community Population Survey,
Voting and Registration in the Election of November 2020, Table 14a. Reported Voting and Registration for States: November 2020 (April 2021) *available at* https://www2.census.gov/programs-surveys/cps/tables/p20/585/table04a.xlsx

November 2020, approximately 33 percent of eligible citizens in Florida, or one in three, were not registered to vote. The unregistered citizen population is not distributed equally among racial groups. While approximately only 29 percent of voting-age white citizens are unregistered, 35 percent of Black voting-age citizens, nearly 44 percent of Asian American voting-age citizens, and 41 percent of Hispanic voting-age citizens are unregistered.[4]

46.     Voter registration drives play an important role in facilitating voter registration of eligible citizens. Community-based voter registration drives are a particularly important tool for members of marginalized communities to register to vote. According to the CPS, voters of color are more likely to identify as having registered at a registration drive or at a school, hospital, or campus compared with white voters. For example, in the 2018 election cycle, while 3.1 percent of white voters reported registering through a drive, the percentage was 5.3 for voters identifying as Black and 5.5 percent for those identifying as Hispanic.[5] Similarly, in 2018, 4.1 percent of white registrants reported registering at a school, hospital, or

---

[4] U.S. Census Bureau, Community Population Survey,
Voting and Registration in the Election of November 2020, Table 4b. Reported Voting and Registration, by Sex, Race and Hispanic Origin, for States: November 2020 (April 2021) *available at* https://www2.census.gov/programs-surveys/cps/tables/p20/585/table04b.xlsx
[5] U.S. Census Bureau, Community Population Survey,
Voting and Registration in the Election of November 2018. Table 12. Method of Registration by Selected Characteristics: November 2018 *available at* https://www2.census.gov/programs-surveys/cps/tables/p20/583/table12.xlsx.

campus, compared with 7.5 percent of those identifying as Black and 7.1 percent of those identifying as Hispanic.[6] In the 2020 cycle, even with much of the election cycle coinciding with the Covid-19 pandemic, 2.4 percent of white voters reported registering through a drive, while 3.6 percent of voters identifying as Black and 3.8 percent for those identifying as Hispanic reported doing the same.[7] Similarly, in 2020, 2.5 percent of white registrants reported registering at a school, hospital, or campus, compared to 4.2 percent of those identifying as Black and 4.4 percent of those identifying as Hispanic.[8]

47.     Plaintiffs, like many community voter registration organizations, conduct or intend to conduct voter registration drives in Florida[9], during which they interact with potential voters face-to-face to encourage them to participate in the political process and to register to vote. These conversations take place at schools and universities, community events, parks, churches, workplaces, malls, conferences, and public gatherings, as well as in parking lots, transportation hubs, and on city streets. These initial interactions culminate when the organization

---

[6] *Id.*

[7] U.S. Census Bureau, Community Population Survey, Voting and Registration in the Election of November 2020, Table 12 (Method of Registration by Selected Characteristics) (April 2021) *available at* https://www2.census.gov/programs-surveys/cps/tables/p20/585/table12.xlsx.

[8] *Id.*

[9] Plaintiff HeadCount has been a registered 3PVRO since June 2012. Plaintiff Harriet Tubman Freedom Fighters submitted its materials to register as a 3PVRO to the Division and is awaiting approval; its staff and volunteers have volunteered on behalf of other 3PVRO-registered organizations.

collects voter registration applications from potential voters and submits them on their behalf. Critically, they seek to develop relationships with new voters to further promote civic engagement, including through get-out-the-vote activities and other community involvement.

48.      Plaintiffs' voter registration staff and volunteers educate non-voters not only about how political participation can lead to social change and make democratic institutions more responsive to community needs, but also how the act of registering to vote helps underrepresented persons and communities establish their political worth, standing, and right to speak at the polls. Registering and voting builds the political respect and power of a citizen's community by making elected officials and candidates for elected office attentive to the citizen's community. Fostering political and civic engagement in this manner is a central part of Plaintiffs' voter registration activity.

49.      Numerous Floridians who register to vote each year do so through interactions with their fellow citizens through such voter registration outreach activities. Plaintiffs' voter registration activities are critical to Plaintiffs' core political speech and associational rights.

50.      The right to vote is far from universally exercised. Through their voter registration work, Plaintiffs express the importance of civic engagement and political participation, particularly among politically underrepresented groups. By

ensuring people's voter registration forms are properly submitted, Plaintiffs ensure the fullest expression of their communities and voters' views on issues such as government responsiveness, racial justice, and policies that promote religious tolerance and acceptance. Plaintiffs' assistance to others in registering to vote is a political statement in and of itself: that they value the democratic process and the rights of all eligible citizens to access the franchise. Plaintiffs' voter registration activities are among the most effective and credible means of expressing these views.

51.     By engaging in voter registration activities, Plaintiffs also develop, and intend to develop in the future, associations with individuals who share their values and goals.

52.     SB 90's requirement compelling Plaintiffs to misleadingly denigrate their own voter registration efforts will chill Plaintiffs' speech, expression, and associational activities. This will harm the organizational mission of each Plaintiff by minimizing each Plaintiff's ability to rally its community and use the franchise to weigh in on issues of importance, including the importance of participation itself.

## II.     Florida Historically Targets Community Voter Registration Activity with Unconstitutional First Amendment Limitations

53.     During the 2005 legislative session, the Florida legislature enacted the Third-Party Voter Registration Law ("the Law") to regulate organizations that

conduct community voter registration activity. Fla. Stat. § 97.0575 (2005). It imposed fines upon 3PVROs if the completed voter registration applications they collected—through no fault of their own—were not delivered to the applicable supervisor of elections within 10 days, before the registration books closed, or at all. *Id.* The Law exempted political parties from these regulations without any demonstration that the penalties or the carveout of the parties advanced the state's interests. *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d. 1314, 1339 (S.D. Fla. 2006).

54.     This Court found these provisions unconstitutionally violated the plaintiffs' First Amendment rights and enjoined Florida from enforcing them. *Id.* at 1342. The court found that:

> the Law's demonstrated impact is to limit the means of voter registration in Florida, contradict the longstanding tradition of not discriminating against non-political parties with respect to voter registration, and burden the Plaintiffs' protected speech and associational rights. While the Court is extremely reluctant to set aside an enactment of the Legislature, given the magnitude of Plaintiffs' First Amendment freedoms at stake in this case, the Third–Party Voter Registration Law's civil penalties scheme and exclusion of political parties is unconstitutional.

*Id.* at 1339.

55.     Undeterred, Florida's policing of community voter registration escalated in 2011 with the passage of a new set of amendments to the Law that required 3PVROs to deliver voter registration applications to the applicable

supervisor of elections within 48 hours of completion or the next business day and fined them anywhere from $50 to $500 per voter registration application for failing to do so, with a cap of $1000 assessed to an organization in a calendar year. *See*, Fla. Stat. § 97.0575(3)(a) (2011).

56.    The 2011 amendments to the Law also required 3PVROs to identify each of its officers and/or agents (including volunteers who solicit, but do not collect, voter registration forms) to the Division of Elections ("the Division") and, if any such person departs the organization, to report such change within 10 days.  Fla. Stat. § 97.0575(1) (2011); Fla. Admin. Code r. 1S-2.042(2)(e)-(3)(e) (2011), *available at* https://www.flrules.org/Gateway/View_notice.asp?id=10555848.

57.    In addition, the 2011 amendments required 3PVROs' agents to each file a sworn statement that they will obey election laws on a form that stated the penalties for false registration but did not make clear that such penalties only applied to a willful submission of false voter registration information. *See* Fl. Stat. §§ 97.0575(1)(d) 104.011 (2011); Fla. Admin. Code r. 1S-2.042(1)(b) (2011).

58.    Lastly, the 2011 amendments required 3PVROs to report to the Division, by the 10th of each month, the number of voter registration forms they provided to their agents and received back.  Fl. Stat. § 97.0575(5) (2011); Fla. Admin. Code r. 1S-2.042(5)(a) (2011).

59.    Once again, this Court found these provisions likely violated the plaintiff organizations' First Amendment rights and the National Voter Registration Act of 1993, and preliminarily enjoined Florida from enforcing them fully as written. *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1168 (N.D. Fla. May 31, 2012). The court later entered a permanent injunction under similar terms with only minor changes pursuant to the parties' agreement. *League of Women Voters of Fla. v. Detzner*, No. 4:11CV628-RH/WCS, 2012 WL 12810507, at *1 (N.D. Fla. Aug. 30, 2012).[10]

## III.    Prior to SB 90, Florida Significantly Regulated 3PVROs

60.    Following the 2012 court order in *Browning*, community voter registration activity remained heavily and comprehensively regulated in Florida through its 3PVRO regulatory scheme.

61.    3PVROs must register directly with the Division and provide detailed information about their operations, officers, employees, and agents.[11]

62.    The Division publishes this information online in its free, publicly accessible 3PVRO database.

---

[10] Some of SB 90's changes to § 97.0575 deleted provisions already enjoined by the 2012 ruling. *See* Fla. Ch. Laws ch. 2021-11 § 7 (deleting provisions of § 97.0575(1) and (5)).

[11] *See* Florida Third-Party Voter Registration Organization Registration Form, Fla. Div. of State, Form DSDE-119, *available at* https://files.floridados.gov/media/693298/dsde119.pdf.

63.     Defendant Lee promulgates the Florida state voter registration form. Fla. r. 1S-2.040. The form lists various methods for registering to vote, including that the form is available online at https://registertovoteflorida.gov. It also contains information regarding the voter registration deadline.

64.     Notably, not all Florida voting-eligible citizens are able to register fully online because, to submit a Florida voter registration application online, an applicant must have a Florida driver's license or identification card issued by the Department of Highway Safety and Motor Vehicles ("DHSMV"). Fla. Stat. § 97.0525(4)(c)(2020). If an applicant has not been issued a Florida driver's license or Florida identification card, the online voter registration system populates the applicant's information into a printable voter registration application that the applicant must print, sign, date, and deliver to the supervisor of elections. *Id.*

65.     In addition, Florida law explicitly deems 3PVROs fiduciaries of the voter registration applicant and requires them to submit any and all completed voter registration applications by the book closing or within a certain number of days after the applicant's completion.  Fla. Stat. § 97.0575(3) (2020); Fla. Admin Code. Ann. r. 1-S2.042(5)(a)(2012).[12]

---

[12] As revised by SB 90, Florida Stat. § 97.0575 now requires that applications collected by 3PVROs be delivered "within 14 days after being completed by the applicant, but not after registration closes for the next ensuing election." Fla. Stat. Ann. § 97.0575(3)(a) (West 2021).

66.     If a 3PVRO fails to return a voter registration applicant's forms within the specified period it may be subject to fines and referred to the Florida Attorney General for legal action. Fla. Stat. § 97.0575(3)-(4) (2020).

## IV.     SB 90's Changes to Florida's Existing 3PVROs Regulatory Framework

67.     The 2021 amendments to the Law encompassed within SB 90 Section 7, are cut from the same unconstitutional cloth as their predecessors; they are an unnecessary abrogation of 3PVROs' First Amendment rights.

68.     Specifically, they require that 3PVROs "notify the applicant at the time the application is collected that the organization might not deliver the application to the division or the supervisor of elections in the county in which the applicant resides in less than 14 days or before registration closes for the next ensuing election and must advise the applicant that he or she may deliver the application in person or by mail." Fla. Stat. Ann. § 97.0575(3)(a) (2021) (emphases added).

69.     They also require that, at the time of soliciting voter registrations, 3PVROs "inform the applicant how to register online with the division and how to determine whether the application has been delivered."[13] Id. (emphasis added).

_____

[13] Notably, Florida has no centralized system for the public to determine whether a voter registration application has arrived at the division of elections or a supervisor of elections' office, meaning applications may not be entered in the state's system on the day they are received. See Fla. Stat. § 97.053(7) (2020) (requiring applications to be entered into the statewide voter registration database by a registration official "within 13 days after receipt").

70.     During the legislative process, lawmakers failed to advance any meaningful evidence of registrant confusion as to the nature of the organizations' activities or of any systemic or purposeful instance of late-delivered or undelivered applications.

71.     SB 90, including the provisions in Section 7 of the Law challenged in this case, had an immediate effective date, giving voter registration organizations, including plaintiffs, little to no time to plan.

72.     Historical data that the Division gathered and published on voter registration shows that 59,805 new voters were registered via 3PVROs in 2020, compared to 2019, when 63,212 voters registered through 3PVROs, and 2018, when 96,516 voters registered through 3PVROs.[14]

73.     In the leadup to the 2021 legislative session, there were no reported widespread problems with 3PVRO voter registration activity. In particular, on information and belief, there is no evidence of widespread untimely submitted applications.

74.     Given these historical and statistical realities, there is no legitimate, let alone compelling, reason for why the Florida legislature moved quickly to mandate that community organizations conducting voter registration activities engage in

---

[14] See Voter Registration – Method & Location, Fla. Div. of Elections, *available at* https://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-registration-reportsxlsx/voter-registration-method-and-location/ (last updated Apr. 30, 2021).

prescribed speech disclaiming their effectiveness and competence, and provide potential voters information about the state's preferred method of "how to register" online, regardless of whether that option is actually available to the applicant, and pass along information regarding application status that is not uniformly available.

## V.   Florida's 2021 Legislative Session Created a Cloud of Repression for First Amendment Freedoms

75.   SB 90 and its heightened restrictions on community voter registration organizations' speech and activity did not occur in a vacuum as a single isolated piece of legislation; they occurred during a legislative session marred by stymied public input, legislative directives from Florida's chief executive, and similarly extreme bills restricting civic freedoms.

76.   Mere weeks before SB 90 passed and a day before the announcement of the verdict in the George Floyd murder trial, Florida passed HB 1, a bill expanding felonies and mandating minimum sentences for activities associated with public assembly and protest, and immediately sent it to the governor for his signature.[15]

---

[15] *See* Ch. 2021-6, Laws of Fla. (defining a felony riot crime under § 870.01(2) where an individual "participates in a violent public disturbance involving an assembly if three or more persons, acting with a common intent to assist each other in . . . disorderly conduct, resulting in . . . imminent danger of injury to another person or damage to property. *See also* Press Release, Ron DeSantis, Governor, Florida, Governor Ron DeSantis Announces the "Combatting Violence, Disorder and Looting and Law Enforcement Protection Act," press release on Sept. 21, 2020, *available at* https://www.flgov.com/2020/09/21/governor-ron-desantis-announces-the-combatting-violence-disorder-and-looting-and-law-enforcement-protection-act/ (proposed new legislation making it a "3rd degree felony when 7 or more persons are involved in an assembly and cause damage to

77.     Governor DeSantis publicly advocated for HB 1 well before it came to his desk for signature; on September 21, 2020, a week before voter registration closed for the 2020 general election, he issued a proposed legislation blueprint for what would eventually become HB 1 and exhorted "every single person running for office. . . to let voters know where you stand on this bill[.]"[16]

78.     Both restrictive bills were rammed through the Florida legislature during a session marked by drastically curtailed public access and participation, with limited access to the state legislature, one minute time caps on public comment, and silencing public commenters expressing opposition.

79.     In another unusual move for a state government with expansive Sunshine Laws, Florida's governor barred all media from attending his signing of SB 90, but live-streamed what his communications director characterized as a "Fox exclusive" on Fox & Friends, in which he signed SB 90 and then presented tv-ready "graphics" summarizing the bill as "Banning Ballot Harvesting" and "Private Money from Running Elections (aka Zuckerbucks)."[17]

---

property or injury to other persons"); *Dream Defenders et al. v. DeSantis*, 4:21-cv-00191-MW-MAF (N.D. Fla. filed May 11, 2021).

[16] *See* Kirby Wilson, "Ron DeSantis: Any Municipality that 'defunds' police will lose state funding," *Tampa Bay Times* (Sept. 21, 2020), *available at* https://www.tampabay.com/news/florida-politics/2020/09/21/ron-desantis-any-municipality-that-defunds-police-will-lose-state-funding/.

[17] *See* Renzo Downey, "Gov. DeSantis signs elections bill in Fox News exclusive," *Fla. Pol.* (May 6, 2021), *available at* https://floridapolitics.com/archives/427313-gov-desantis-signs-elections-bill-in-fox-news-exclusive/; Gary Fineout, DeSantis gives Fox "exclusive" of him signing election

80.    Given the lack of transparency throughout the consideration and passage of SB 90, coupled with legislators and the governor's public statements advocating for these restrictions and others curtailing the right to associate, assemble, and engage in protest, speech, and other core political activities in Florida, it is clear SB 90 was not intended to promote civic engagement or protect voters, but instead to repress Plaintiffs' constitutionally protected right to free speech, their right not to be compelled to engage in government speech, and their freedom to associate with other civic-minded Floridians.

81.    Because of SB 90, Plaintiffs must divert scarce resources to comply with the new requirements imposed under Section 97.0575(3)(a). These requirements unnecessarily conscript Plaintiffs' scarce organizational resources that would otherwise be spent helping voters register, following up with voters, and undertaking other activities to advance their missions. Resources that would otherwise be directed at reaching and engaging voters must now be spent on training time and materials for an unnecessary law.

---

bill, Politico (May 6, 2021), *available at* https://www.politico.com/states/florida/story/2021/05/06/desantis-gives-fox-exclusive-of-him-signing-election-bill-1380665?nname=florida-playbook&nid=0000014f-1646-d88f-a1cf-5f46b4500000&nrid=31980f02-54f3-47e5-ad73-6e3f1cc93947&nlid=630310; NBC 6 and The Associated Press, "Gov. DeSantis Signs GOP-Backed Elections Bill at Event Closed to Local Media," *6 South Florida*, May 6, 2021, *available at* https://www.nbcmiami.com/news/local/gov-desantis-signs-gop-backed-elections-bill/2444871/; Steve Contorno, "Did DeSantis violate First Amendment with Fox News only bill signing?" *The Tampa Bay Times* (May 7, 2021) *available at* https://www.tampabay.com/news/florida-politics/2021/05/07/did-desantis-violate-first-amendment-with-fox-news-only-bill-signing/.

## CLAIMS FOR RELIEF

## COUNT I

### Void for Vagueness
### (Violation of Plaintiffs' Fourteenth Amendment Right
### Pursuant to 42 U.S.C. § 1983)

82.    Plaintiffs repeat and reallege each and every allegation contained in preceding paragraphs as if fully set forth herein.

83.    The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

84.    "The void-for-vagueness doctrine reflects the principle that a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Harris v. Mex. Specialty Foods, Inc.*, 564 F.3d 1301, 1310 (11th Cir. 2009) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984)) (internal quotation marks omitted) (alteration in original).

85.    "Vagueness within statutes is impermissible because such statutes fail to put potential violators on notice that certain conduct is prohibited, inform them of the potential penalties that accompany noncompliance, and provide explicit standards for those who apply the law." *Id.* at 1311. Lawmakers must observe

"rigorous adherence" to the Due Process Clause's notice requirements when crafting statutes regulating free speech. *Wollschlaeger v. Gov. of Fla.*, 848 F.3d 1293, 1320 (11th Cir. 2017) (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)).

86.     The void for vagueness doctrine applies when violation of a statute triggers civil proceedings, as well as when criminal prosecution is threatened. *See id.* (invalidating as void for vagueness a statute subjecting noncompliant medical doctors to disciplinary action by the Florida Board of Medicine). Given Plaintiffs' finite resources, the imposition of substantial financial penalties, costs associated with unknown legal proceedings, or revocation of their 3PVRO status for inadvertent violations of Section 97.0575 would threaten Plaintiffs' ability to carry out voter registration activities.

87.     Section 97.0575 does not specify the penalties for failing to issue these statements to potential applicants; it simply provides that:

> If the Secretary of State reasonably believes that a person has committed a violation of this section, the secretary may refer the matter to the Attorney General for enforcement. The Attorney General may institute a civil action for a violation of this section or to prevent a violation of this section.

Fla. Stat. § 97.0575(4). Nor does it identify what civil penalties the Attorney General may pursue, the range or maximum amount of such penalties, or even whether failure to provide the required disclaimer and disclosures constitutes a "violation" within the meaning of this provision. Nor does it indicate whether its provisions apply to

registration activities that include Florida registrants located outside the state. Further, it does not identify whether individual volunteers would face consequences for a "violation" under the law. Plaintiffs do not want to put their volunteers at risk and would recruit fewer volunteers if they are subject to penalties, especially the first-time volunteers that the organization works to engage.

88.     Section 97.0575, as amended by SB 90, requires Plaintiffs to make the mandatory disclaimer and disclosures, but does not put Plaintiffs on adequate notice as to the specific consequences—if any—of noncompliance. Its omission of a range of civil penalties or maximum civil penalty that the Attorney General may seek pursuant to Section 97.0575(4) risks allowing the Attorney General to enforce the statute "on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Harris*, 564 F.3d at 1312 (quoting *Grayned v. City of Rockford*, 408 U.S. 104 (1972)). It therefore must fail as void for vagueness, in violation of the Fourteenth Amendment.

## COUNT II

### Compelled Speech
### (Violation of Plaintiffs' First Amendment Rights
### Pursuant to 42 U.S.C. § 1983)

89.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

90.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I.

91.    The First Amendment applies to the states through the Fourteenth Amendment. In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

92.    "[F]reedom of speech includes both the right to speak freely and the right to refrain from speaking at all." *Janus v. Am. Fed. of State, Cnty., and Mun. Emps.*, 138 S. Ct. 2448, 2463 (2018) (citation omitted). Consequently, the government cannot compel individuals to speak. *Masterpiece Cakeshop Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1745 (2018).

93.    In the same vein, "[b]ecause the government cannot compel speech, it also cannot 'require speakers to affirm in one breath that which they deny in the next.'" *Id.* (quoting *Pacific Gas & Elec. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 16 (1986)).

94.    Laws "compelling individuals to speak a particular message . . . alte[r] the content of [their] speech.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (quoting *Riley v. Nat'l Fed'n of Blind of N. C., Inc.*, 487 U.S. 781, 795 (1988)). Content-based regulations of speech "are presumptively

unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 2365 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

95.    Voter registration activity is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 422–23; *see also Buckley v. Am. Const. Law Found.*, 525 U.S. 182, 186–87 (1999) (quoting *Meyer*, 486 U.S. at 422). Whether a voter should register and ultimately participate in an election is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking criminal sanctions." *Meyer*, 486 U.S. at 421.

96.    SB 90's disclaimer and disclosure provision requires Plaintiffs to "notify the applicant at the time the application is collected that the organization might not deliver the application to the division or the supervisor of elections in the county in which the applicant resides in less than 14 days or before registration closes for the next ensuing election . . ." Fla. Stat. § 97.0575(3)(a). They also "must advise the applicant that he or she may deliver the application in person or by mail" and "inform the applicant how to register online with the division and how to determine whether the application has been delivered." *Id.* This "disclosure requirement" therefore constitutes a "government-drafted script" that alters the content of Plaintiffs' speech. *Nat'l Inst. of Fam. & Life Advocs.*, 138 S. Ct. at 2371.

97.     The portion of the disclosure requirement requiring Plaintiffs' agents to tell applicants that Plaintiffs may fail to timely submit their completed voter registration forms is false. Section 97.0575(3)(a) requires that completed registration forms "be promptly delivered to the division or the supervisor of elections in the county in which the applicant resides within 14 days after completed by the applicant." Fla. Stat. § 97.0575(3)(a). This provision, therefore, unconstitutionally forces Plaintiffs to speak for the government, making disclaimers that Plaintiffs would not otherwise recite.

98.     Furthermore, Plaintiffs make every effort to turn in applications on time in conjunction not only with Florida state law, but with their missions to increase voter participation and civic engagement. The disclaimer required by Section 97.0575(3)(a) requires Plaintiffs to undermine their own work, message, and mission by requiring Plaintiffs to state that they "might not" turn in the application on time, especially when Plaintiffs have every intention to submit the forms on time. Therefore, such a compelled declaration is at worst false and, at best, misleading.

99.     Such a disclaimer also falsely suggests that voters should *not* turn in applications to Plaintiffs if they want to be sure they are registered to vote when, in fact, potential voters are less likely to timely submit voter registration forms on their own as compared to 3PVROs like Plaintiffs.  Plaintiffs are further incentivized to timely submit the forms because their mission is dependent on building trust with

applicants and creating a community of volunteers and civically engaged registered voters. This misleading statement undermines a voter's confidence that their voter registration application form will result in their timely, valid registration. *See League of Women Voters of Tenn. v. Hargett*, 400 F. Supp. 3d 706, 714 (M.D. Tenn. 2019).

100.   This provision also hinders Plaintiffs' efforts to develop relationships with registrants and will improperly diminish Plaintiffs' credibility in the communities in which they work as they further engage in necessary follow-up assistance with voter registration or voting.

101.   In the same way, the disclaimer requirement also impermissibly induces Plaintiffs to refute the information it must communicate, in order to reassure applicants that their voter registrations will be timely delivered, violating Plaintiffs' right not to speak. *See Pacific Gas & Elec. v. Pub. Util. Comm'n of Cal.,* 475 U.S. at 11 (1986) (noting that "…the State is not free either to restrict appellant's speech to certain topics or views or to force appellant to respond to views that others may hold.").

102.   The mandatory disclaimer serves no legitimate governmental function or purpose, as there is no evidence that Floridians have been confused about the nature of community-based voter registration activity. There is no suggestion that Plaintiffs or similar voter registration groups have regularly turned in late forms or that they would make anything other than their best efforts to timely submit forms.

This is particularly true where there are already existing penalties for late-delivered forms. There is also no evidence that telling applicants they can register online or submit in their applications themselves produces *more* timely-registered voters. To the contrary, in Plaintiffs' experience, this approach is likely to lead to *fewer* voters becoming registered.

103.   However, the mandatory disclaimer does serve to significantly impede Plaintiffs' mission of connecting with new voters and those without Florida driver's licenses and printer access (who must print, sign, and submit their applications created online in order to register to vote) because in-person registration is more effective for reaching these prospective voters and field registration using paper forms is the most effective means of promoting voter registration at the events, festivals, and communities where Plaintiffs operate.

104.   Additionally, in Plaintiffs' experience, individuals who express interest in voter registration are far more likely to become registered and vote when the application is submitted on the applicant's behalf by a trusted organization with whom the prospective voter has had personal contact.

105.   With respect to the requirement that Plaintiffs inform applicants of the methods by which they may submit their own voter registration applications, Florida (through its Secretary of State) already has the means to, and, in fact, does provide this information to applicants who use the Florida Voter Registration Application.

Florida's Secretary of State could—but has not—created a centralized system to determine whether applications returned by mail have been successfully submitted, and then the Secretary could include this information on the form.  It also could—but fails to—notify applicants who submit their completed forms through a third-party organization that under Florida law the organization has 14 days to submit their forms to the appropriate supervisor's office and could—but does not—inform applicants how they can determine whether their completed registration form was delivered. Florida, therefore, has the power to disseminate this information to applicants, without imposing a disclosure requirement on Plaintiffs and similarly situated organizations. But they have instead chosen to impose these messages on Plaintiffs.

106.   These mandated disclosures also require Plaintiffs to speak to services provided by the Florida state government. Florida is thus co-opting Plaintiffs to promote the state's online voter registration system despite the fact that the system cannot be used to fully register online if the applicant does not have a Florida driver's license or state ID, *see* Fla. Stat. § 97.0525(4)(c), and that Florida already provides the website for the online registration system on its own state form.

107.   The Supreme Court has invalidated mandated disclosures that do not speak to the services provided by the non-government party, but by the government itself. *See Nat'l Inst. of Fam. & Life Advocs.*, 138 S. Ct. at 2372 ("The notice in no

way relates to the services that licensed clinics provide. Instead, it requires these clinics to disclose information about *state*-sponsored services . . .". (emphasis in original)).

108.   In these ways, Section 97.0575(3)(a) directly and unjustifiably restricts Plaintiffs' core political speech and expressive conduct in communicating their belief in the capacity of the popular will to shape the composition and direction of government. Advocating for that belief through their endeavors to assist others in registering to vote is in itself a political statement.

109.   As a result of the new disclaimer requirements that SB 90 will needlessly and unjustifiably place on Plaintiffs' voter registration activities, Plaintiffs will have to expend additional resources to conduct voter registration. But for these burdens imposed by SB 90, these resources could be spent on Plaintiffs' other activities. In addition, Plaintiffs believe their voter registration efforts will be less effective and their missions will be frustrated because of the misleading disclosure requirements SB 90 imposes.

110.   To the extent the state government thinks that the message required by Section 97.0575(3)(a) is needed, the government must speak for itself. Defendants cannot co-opt Plaintiffs' and other civic organizations' speech to further their own government message.

111.   For these reasons, Section 97.0575's mandated disclosures constitute compelled speech, in violation of the First Amendment.

## COUNT III

### Free Speech and Association
### (Violation of Plaintiffs' First Amendment Rights
### Pursuant to 42 U.S.C. § 1983)

112.   Plaintiffs repeat and reallege each and every allegation contained in preceding paragraphs as if fully set forth herein.

113.   Plaintiffs wish to exercise their rights to promote civic engagement and associate with potential voters. The "freedom to associate with others for the common advancement of political beliefs and ideas is a form of orderly group activity protected by the First and Fourteenth Amendments." *Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973) (internal quotations omitted).

114.   As a consequence of requiring Plaintiffs to undermine their own credibility, effectiveness, and message, SB 90 directly restricts Plaintiffs' core political speech and expressive conduct in communicating their belief in the capacity of the popular will to shape the composition and direction of the government. Advocating for that belief through their endeavors to assist others in registering to vote is in itself a political statement. Moreover, the Law implicates Plaintiffs' associational rights in banding together to engage in voter registration activity and in assisting community members to join the civic community by registering to vote.

115.   Like the circulation of an initiative petition for signatures, voter registration activity is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 422; *see also Buckley*, 525 U.S. at 186–87 (quoting *Meyer*, 486 U.S. at 422). Whether a voter should register and ultimately participate in an election is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking criminal sanctions." *Meyer*, 486 U.S. at 421.

116.   Section 97.0575(3)(a) burdens Plaintiffs' First Amendment rights by diminishing the value and nature of their expression through delegitimizing the content of their organizational message and their ability to communicate with their chosen audience. The disclaimer and disclosure provisions impair Plaintiffs' ability to associate, help citizens register to vote, and express their collective views.

117.   The disclaimer and disclosure provision in SB 90 is an impermissible content-based restriction on speech because speakers who discuss voter registration are subject to restrictions that other speakers are not.

118.   These requirements are not narrowly tailored to serve any compelling state interest. Indeed, these requirements do not actually advance any legitimate regulatory interest, and serve little purpose other than to make civic engagement activities more difficult and less successful, and dissuade individuals from engaging in voter registration activity and thereby associating with Plaintiffs. Under the

exacting scrutiny applied in *Meyer*, or any other level of judicial scrutiny, these requirements fail.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

A.      Declare that the disclaimer and disclosure requirements in Fla. Stat. § 97.0575(3)(a) violate the First and Fourteenth Amendments of the United States Constitution;

B.      Preliminarily and permanently enjoin Defendants from enforcing the disclaimer and disclosure requirements in Fla. Stat. § 97.0575(3)(a).

C.      Retain jurisdiction to render any and all further orders that this Court may deem necessary;

D.      Award Plaintiffs their attorneys' costs and fees pursuant to statute; and

E.      Grant any and all other relief this Court deems just and proper.

Dated:      June 14, 2021                    Respectfully submitted,

/s/ Nancy G. Abudu
Nancy G. Abudu (Fla. Bar No. 111881)
Emma C. Bellamy*
Southern Poverty Law Center
P.O. Box 1287
Decatur, Ga 30031-1287
Tel: 404-521-6700
Fax: 404-221-5857
nancy.abudu@splcenter.org
emma.bellamy@splcenter.org

Michelle Kanter Cohen*
Jon Sherman*
Cecilia Aguilera*
Fair Elections Center
1825 K Street NW, Suite 450
Washington, DC 20006
Tel.: (202) 331-0114
mkantercohen@fairelectionscenter.org
jsherman@fairelectionscenter.org
caguilera@fairelectionscenter.org

*Attorneys for Plaintiffs*
*application for admission *pro hac vice*
forthcoming