## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF
## TALAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS OF
FLORIDA, INC., *et al.*,

       Plaintiffs,

v.

LAUREL M. LEE, in her official
capacity as Secretary of State of
Florida, *et al.*,

       Defendants,

and

NATIONAL REPUBLICAN
SENATORIAL COMMITTEE, *et al.*,

       Intervenor-Defendants.

Case No. 4:21-cv-186-MW-MAF

Consolidated with Case Nos.
4:21-cv-187 and 4:21-cv-242

Motion to Transfer Pending in Case
No. 4:21-cv-201

## SECRETARY OF STATE'S OMNIBUS MEMORANDUM OF
## LAW IN SUPPORT OF HER MOTIONS TO DISMISS

### I.    <u>Introduction</u>

Sometimes what we want to hear the least is what we need to hear the most. The Plaintiffs need to hear and understand that Article I, Section 4 of the U.S. Constitution entrusts the Florida Legislature with setting the "times, places and manner" of elections; that Article III, Section 1 and Article VI, Section 1 of the Florida Constitution does much the same; that "[c]ommon sense, as well as

1

constitutional law, compels the conclusion that government must play an active role in structuring elections," *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); and that Chapter 2021-11, Laws of Florida (the "2021 Law") is the kind of reasonable, non-discriminatory law that falls within the Florida Legislature's constitutional purview. *See Burdick*, 504 U.S. at 433; *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).

Even the Plaintiffs seemingly acknowledge the reasonableness of the 2021 Law as a whole. After all, the four complaints before this Court challenge only five of the thirty-two sections in the 2021 Law: sections 7, 24, 28, 29, and 32. *See* **Exhibit A** (Chpt. 2021-11, Laws of Fla. (2021)).[1] Section 7 requires that third-party voter registration groups inform people that "the organization might not deliver the application to the division [of elections] or the [relevant] supervisor of elections . . . in less than 14 days or before registration closes for the next ensuing election," that people can themselves deliver applications "in person or by mail," or that they can "register online" with the State. Section 24 asks that voter make two requests for vote-by-mail ballots every four years (instead of one) after the 2022 election cycle; it also asks that voters use information such as the last four digits of their social security number when making the requests. Section 28 makes changes to the State's drop box provision—a provision implemented for the first time throughout the State

---

[1] The corresponding statutory citations for these five sections of the 2021 Law are, respectively, Fla. Stat. §§ 97.0575, 101.62, 101.69, 102.031, and 104.0616.

during the 2020 election cycle.   Section 29 revises the State's existing non-solicitation provision so that "engaging in any activity with the intent to influence or effect of influencing a voter" is prohibited, which in no way deprives voters of water (among other things) as some allege.   And section 32 places a commonsense limitation on ballot collection, making State law consistent with an ordinance long implemented in Miami-Dade County.

While the Plaintiffs only challenge five sections of the 2021 Law, they take aim at these five sections through several theories of harm, spread over a dozen counts, many of which miss the mark for one reason or another.   The Secretary thus moves to dismiss Counts I (Undue Burden) and III (Vague and Overbroad) in Case No. 186 (the *League of Women Voters* case); Counts I (Section 2, Voting Rights Act, Discriminatory Results), II (Undue Burden), III (Americans with Disabilities Act or ADA), V (Vague and Overbroad), VI (Fourteenth Amendment, Intentional Race Discrimination), VII (Fifteenth Amendment, Intentional Race Discrimination), VIII (Section 2, Voting Rights Act, Intentional Race Discrimination), and IX (Section 208, Voting Rights Act) in Case No. 187 (the *NAACP* case); Counts I (Section 2, Voting Rights Act, Intentional Race Discrimination and Discriminatory Results), II (Fourteenth Amendment, Intentional Race Discrimination), III (Fifteenth Amendment, Intentional Race Discrimination), IV (Undue Burden), V (Vague and

3

Overbroad), and VI (Section 208, Voting Rights Act) in Case No. 201 (the *Florida Rising* case); and Count I (Vagueness) in Case No. 242 (the *Harriet Tubman* case).

 Given the overlap in the four complaints, the Secretary groups the allegations into six categories for the sake of brevity and clarity: (1) Undue Burden, (2) Intentional Discrimination, (3) Discriminatory Effect, (4) Vagueness and Overbreadth, (5) ADA, and (6) Section 208 of the Voting Rights Act.

## II.  **Legal Standards for Motion to Dismiss**

Standing under Article III of the U.S. Constitution presents a threshold jurisdictional determination, placing the burden squarely on the Plaintiffs to "clearly . . . allege facts demonstrating" standing. *Warth v. Seldin*, 422 U.S. 490, 518 (1975). The Plaintiffs must thus establish for *each* of their claims the "irreducible constitutional minimum[s]" of (1) an injury that is concrete and particularized, or actual or imminent; (2) caused by the Defendant; and (3) redressable, at least in part, through a favorable decision for the Plaintiffs and against the Defendant. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Failure to establish standing provides grounds to dismiss under Federal Rule of Civil Procedure 12(b)(1).

To withstand a motion to dismiss under Rule 12(b)(6), a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007).  Facts not alleged cannot be assumed. *Id.* at 563 n.8.  Allegations must amount to "more than labels and conclusions." *Id.* at 555.

"[F]ormulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Twombly*, 550 U.S. at 555).

Judged against these standards, this Court should grant the Secretary's Omnibus Motion to Dismiss.

### III.   <u>Argument</u>

#### A.   **This Court should dismiss the undue burden claims because the right to vote is either not implicated or the Plaintiffs fail to focus on the electorate as a whole.[2]**

This Court should dismiss the counts claiming an undue burden on the right to vote under Rule 12(b)(6).  The *Anderson/Burdick* test applies to claims of an undue burden under the First and Fourteenth Amendments.  That test asks courts to "weigh 'the character and magnitude of the asserted injury to the right [to vote] . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,'" considering "'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).  *Anderson/Burdick* is not, however, a constitutional catch-all.  That test requires courts to first "identify a burden before [they] can weigh it." *Crawford v. Marion*

---

[2] Specifically, this Court should dismiss Count I in the *League of Women Voters* case, Count II in the *NAACP* case, and Count IV in the *Florida Rising* case.

*Cnty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring); *see also Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1261 (11th Cir. 2020). Once a court identifies a burden on the right to vote, the court "consider[s] the laws and their reasonably foreseeable effect on *voters generally*," not on a subset of the electorate, *Crawford*, 553 U.S. at 206 (Scalia, J., concurring); "weighing the burden of a nondiscriminatory voting law upon each voter and concomitantly requiring exceptions for vulnerable voters would effectively turn back decades of equal-protection jurisprudence." *Id.* at 207. In addition, the *Anderson/Burdick* test requires courts to "look[] at the whole electoral system," considering provisions that make voting easier, and should avoid "substitution of judicial judgment for legislative judgment" along the way. *Luft v. Evers*, 963 F.3d 665, 671-72 (7th Cir. 2020) (citing *Burdick*, 504 U.S. at 434, 439).

The *League of Women Voters, NAACP*, and *Florida Rising* Plaintiffs allege that changes to the process for requesting vote-by-mail ballots, adjustments to the drop box statute, the prohibition from "engaging in any activity with the intent to influence or effect of influencing a voter," and the limitation on ballot collection act in concert to unduly burden voting rights.[3] Not so.

---

[3] *See, e.g.*, Case No. 186, ECF 1 at ¶ 6; Case No. 187, ECF 45 at ¶ 75; Case No. 201, ECF 1 at ¶ 16.

6

1.   <u>Vote-by-mail Regulation Does Not Implicate the Right to Vote.</u>

The vote-by-mail request changes, adjustments to the drop box statute, and the ballot collection provision all concern the same thing: voting by mail, asking for a vote-by-mail ballot, and then returning that ballot. Yet the U.S. Supreme Court held in *McDonald v. Board of Education Commissioners of Chicago* that, unless a restriction on vote-by-mail "absolutely prohibit[s]" someone from voting, the right to vote is not at stake. 394 U.S. 802, 809 (1969).

Specifically, in *McDonald*, pretrial detainees argued that their exclusion from four classes of people entitled to vote absentee in Illinois violated the Fourteenth Amendment's Equal Protection Clause. *Id.* at 803-05. The U.S. Supreme Court disagreed. *Id.* at 807. While the U.S. Supreme Court acknowledged that "voting rights[] classifications which might invade or restrain [voting rights] must be closely scrutinized and carefully confined," the unanimous Court held that Illinois's vote-by-mail provisions did not require that "exacting approach" because the detainees had not shown that they were "absolutely prohibited" from voting. *Id.* at 807-808, 808 n.7 (citation omitted). In short, it was "not the right to vote that [was] at stake . . . but a claimed right to receive absentee ballots." *Id.* at 807. The same is true here.

In this case, it cannot be credibly alleged, nor has anyone actually alleged, that requiring voters to make two vote-by-mail requests every four years instead of one; over the phone if they wish; using the last four digits of their social security number

7

along the way; and then returning a vote-by-mail ballot through the mail, in-person, with the help of a family member, or at one of the still-mandated drop box locations results in the electorate being "absolutely prohibited" from voting-by-mail.  Thus, under *McDonald*, the right to vote is not implicated.  Because the right to vote is not implicated, there is nothing to weigh under *Anderson/Burdick*.  *See New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1281 (11th Cir. 2020); *Jacobson*, 974 F.3d at 1261.

The Plaintiffs might respond by urging this Court not to follow *McDonald* because it predates the *Anderson/Burdick* test.  This Court should decline.

*McDonald* remains binding precedent that cannot be ignored.  Importantly, *Anderson*, *Burdick*, and *Crawford* did not squarely address vote-by-mail issues. *McDonald* did.  "If a precedent of [the U.S. Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions," which has not actually happened here,[4] "the [lower courts] should follow the case which directly controls, leaving to [the U.S. Supreme] Court the prerogative of overruling its own decisions."  *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989); *see also Fla. League of Prof'l Lobbyists, Inc. v.*

---

[4] Two subsequent U.S. Supreme Court cases citing *McDonald* have neither overruled nor limited *McDonald* to its facts.  In *Goosby v. Osser*, the Court confronted allegations that "the Pennsylvania statutory scheme [at issue] absolutely prohibited [plaintiffs] from voting," thereby implicating the right to vote under *McDonald*.  409 U.S. 512, 521-22 (1973).  And in *Hill v. Stone*, the Court simply summarized *McDonald*.  421 U.S. 289, 300 n. 9 (1975).

8

*Meggs*, 87 F.3d 457, 462 (11th Cir. 1996) ("[W]e are not at liberty to disregard binding case law that . . . has been only weakened, rather than directly overruled, by the Supreme Court.").

Regardless, *McDonald*'s logic holds firm even after *Anderson/Burdick*. In *Griffin v. Roupas*, a post-*Anderson/Burdick* case, the Seventh Circuit upheld a district court's motion to dismiss a claim on behalf of "working mothers who contend that because it is a hardship for them to vote in person on election day, the U.S. Constitution requires Illinois to allow them to vote by absentee ballot." 385 F.3d 1128, 1129 (7th Cir. 2004). Writing for the Seventh Circuit, Judge Posner, like the majority in *McDonald*, distinguished the right to vote from a claimed "blanket right of registered voters to vote by absentee ballot," *id.* at 1130, and concluded that "unavoidable inequalities in treatment, even if intended in the sense of being known to follow ineluctably from a deliberate policy, do not violate equal protection." *Id.* at 1132. In *New Georgia Project*, the Eleventh Circuit similarly concluded that Georgia's vote-by-mail return deadline "does not implicate the right to vote at all" because "Georgia has provided numerous avenues to mitigate chances that voters will be unable to cast their ballots," and it thus avoided an absolute prohibition on voting. 976 F.3d at 1281.[5]

---

[5] Discussing a procedural due process issue, but citing *McDonald*, Judge Lagoa further explained that "the Supreme Court has unambiguously held that the right to

In sum, *McDonald* controls, and there is no undue burden claim for changes to the vote-by-mail request process or the vote-by-mail return process (the drop box statute and the ballot collection provisions).

2.    The Plaintiffs Must Focus on Electorate as a Whole.

Assuming the Plaintiffs *could* claim an undue burden on the right to vote because of changes to the vote-by-mail process (both asking for a ballot and returning that ballot) or the non-solicitation provision, they still have not done so. The *Anderson/Burdick* inquiry "consider[s] the laws and their reasonably foreseeable effect on *voters generally*," not on a subset of the electorate. *Crawford*, 553 U.S. at 206 (Scalia, J., concurring). But the Plaintiffs focus on a narrow band of potential voters when alleging their claim.

The *League of Women Voters* Plaintiffs allege, for example, that the drop box provision burdens "Floridians who struggle to vote on election day or during early voting hours due to personal circumstances, including restrictive work or class schedules, family care responsibilities, disabilities, health conditions, or other personal circumstances." Case No. 186, ECF 1 at ¶ 82. As to the non-solicitation provisions, they further allege harm to "senior voters, voters with disabilities, or any

---

vote *absentee* is not a fundamental interest that triggers Fourteenth Amendment protections." *New Ga. Project*, 976 F.3d at 1288 (Lagoa, J., concurring).

voter who is forced to wait in long lines at polling places." Case No. 186, ECF 1 at ¶ 113.  So the voters generally are not the subject of the allegations.

The *NAACP* Plaintiffs similarly claim that the drop box restriction will "burden voters who do not receive their VBM ballots until the final days before the election," and presumably cannot vote in-person during the early voting period or on election day.  Case No. 187, ECF 45 at ¶ 82.  As to the ballot collection provisions, the *NAACP* Plaintiffs focus on a subset of the electorate that lacks a car and presumably lacks access to a mailbox, bus, or ride-sharing service, and lives more than walking distance from a supervisor's office or a drop box location.  Case No. 187, ECF 45 at ¶ 89.  As to the non-solicitation provisions, the *NAACP* Plaintiffs state that "[l]ong lines make voters irritable and frustrated, leading some to avoid voting altogether or to leave before voting, producing uncounted numbers of lost votes."  Case No. 187, ECF 45 at ¶ 104 (quotations omitted).  Again, the voters generally are not the subject of the allegations.

The *Florida Rising* Plaintiffs plead that the drop box rules are "particularly burdensome for voters who cannot get time off work," and presumably cannot vote in-person during the early voting period (which includes weekends), and usually includes locations centrally located to business districts.  *See* Case No. 201, ECF 1 at ¶ 103.  Of the vote-by-mail rules generally, they plead that "voters will be barred from obtaining a vote-by-mail ballot because they do not remember the document

11

that they used when registering to vote," and presumably will not have access to their driver's license number, Florida identification number, or social security number to update the necessary information.  Case No. 201, ECF 1 at ¶ 126.  Finally, as to the non-solicitation rules, the *Florida Rising* Plaintiffs allege that they will be barred from providing a list of items, including "food, water, chairs, umbrellas . . . ponchos . . . and entertainment" to voters waiting in line to vote and who, presumably, will choose not to vote without these items specifically provided to them by the *Florida Rising* Plaintiffs.  Case No. 201, ECF 1 at ¶ 129, 132.  *Florida Rising* thus slices the electorate into smaller and smaller subsets.

In sum, the Plaintiffs do not seek to vindicate the rights of the voters generally as *Anderson/Burdick* requires.  Rather, the Plaintiffs speculate that the 2021 Law burdens a certain subset of the electorate already being subjected to an unfortunate confluence of personal and professional circumstances.  The burdens on these vulnerable voters, the Plaintiffs allege, outweigh the State's interests.  Yet "weighing the burden of a nondiscriminatory voting law upon each voter and concomitantly requiring exceptions for vulnerable voters would effectively turn back decades of equal-protection jurisprudence."[6] *Crawford*, 553 U.S. at 207 (Scalia, J., concurring).

---

[6] The Secretary further emphasizes that the non-solicitation provisions of the 2021 Law are not directed at the voters at all but instead at those "engaging in any activity with the intent to influence or [that has the] effect of influencing a voter."  **Exhibit**

**B.    This Court should dismiss the race-based, intentional discrimination claims under the Fourteenth and Fifteenth Amendments, and Section 2 of the Voting Rights Act.[7]**

This Court should also dismiss the intentional, racial discrimination claims under Rule 12(b)(6).  Claims of racial discrimination under the Fourteenth and Fifteenth Amendments to the U.S. Constitution "require[] proof of *both* an intent to discriminate and actual discriminatory effect." *Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021).  Section 2 of the Voting Rights Act, codified at 52 U.S.C. § 10301, requires Plaintiffs to either demonstrate proof of intent or demonstrate "that a challenged election practice has resulted in the denial or abridgement of the right to vote based on color or race."[8]  *Chisom v. Roemer*, 501 U.S. 380, 394 (1991).   The test for intent in *Village of Arlington Heights v. Metropolitan Housing Development Corporation* governs all intent claims at issue here.  429 U.S. 252, 265 (1977).  *Arlington Heights* requires courts to assess:

---

A at § 29 (Pg. 25).  The Plaintiffs fail to allege how limitations on them—not the voters—affect the right to vote.

[7] Specifically, this Court should dismiss Counts VI, VII, and VIII in the *NAACP* case, and Counts II and III in the *Florida Rising* case.

[8] The Secretary notes that while the plain language of Section 2 of the Voting Rights Act does not include an intent claim, certain courts have read an intent test into the statute. The U.S. Supreme Court may clarify this issue in *Brnovich v. Democratic Nat'l Comm.*, No. 19-1257 (U.S. argued Mar. 2, 2021) (reviewing claims brought under Section 2 of the VRA and the Fifteenth Amendment).  For the purposes of this filing, and this filing only, the Secretary assumes that Section 2 of the Voting Rights Act allows for intent claims.

(1) [T]he impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators.   And, because these factors are not exhaustive, the list has been supplemented: (6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives.

*Greater Birmingham Ministries*, 992 F.3d at 1321-22.   Neither the Plaintiffs in *NAACP* nor *Florida Rising* have alleged enough for intent under *Arlington Heights*.

## 1.   The impact of the challenged law.

As the U.S. Supreme Court explained, for discriminatory impact from a challenged provision to carry the day, Plaintiffs must couple impact with sufficient allegations to "establish 'a pattern, unexplainable on grounds other than race.'"   *Id.* at 1322 (citing *Arlington Heights*, 429 U.S. at 266).

The *NAACP* Plaintiffs fails to couple impact with unexplainable pattern.   The complaint simply states that, for example, "[v]oters—especially in these historically disenfranchised communities—have come to rely on drop boxes as a safe and important option for casting a ballot," Case No. 187, ECF 45 at ¶ 78, and that "[t]hird-party ballot return is especially important for Black and Latino voters, who are less likely to have access to a vehicle and less likely to be able to secure time off work."   *Id.* at ¶ 88-89.   Neither of these alleged facts, nor any others alleged in the complaint, "establish a pattern unexplainable on grounds other than race."   *Greater Birmingham Ministries*, 992 F.3d at 1322 (internal quotation omitted).   Therefore,

the allegations are insufficient to satisfy this *Arlington Heights* factor. *Id.* (holding that "small disparities in ID possession rates do not, standing alone, establish a [racially discriminatory] pattern.") (internal quotation mark omitted).

The *Florida Rising* complaint largely provides bare legal conclusions regarding the "Impact of SB 90," stating that "SB 90 includes numerous provisions that impact or burden the right to vote of historically disenfranchised voters and disabled voters," Case No. 201, ECF 1 at ¶ 92. For the same reasons the *NAACP* complaint fails to plead discriminatory impact, however, the *Florida Rising* complaint's factual allegations are incapable of showing a "clear pattern, unexplainable on grounds other than race" that would qualify as the "rare" case where discriminatory impact alone could be determinative, *Greater Birmingham Ministries*, 992 F.3d at 1322.

### 2.   The historical background.

The historical background inquiry focuses not on "an unlimited look-back to the past discrimination" that, "in the manner of original sin, condemn[s] governmental action that is not itself unlawful." *Greater Birmingham Ministries*, 992 F.3d at 1323-26. Instead, there must be some tie to the 2021 Law. *Id.*

The Plaintiffs, however, choose to dwell on the distant past. The *NAACP* Plaintiffs allege that "[f]rom 1972 to 2012 . . . multiple counties in Florida were required under the [Voting Right Act] to seek federal [pre]clearance for changes to

their election laws," Case No. 187, ECF 45 at ¶ 6, but neglect to mention that the State of Florida, as a whole, has never been a covered jurisdiction. The *NAACP* Plaintiffs also attempt to connect the past with today's Florida by invoking post-reconstruction history. Case No. 187, ECF 45 at ¶¶ 37-40. Many of their other allegations simply distort the past, *e.g.*, Case No. 187, ECF 45 at ¶ 41 (mistaken voter purge), or attempt to allude to a discriminatory dimension where there was none, *e.g.*, Case No. 187, ECF 45 at ¶ 42 (adjusting early voting day).

The *Florida Rising* Plaintiffs claim, in an effort to tie Florida's history to the 2021 Law, that "[t]he passage of SB 90 is the latest chapter in Florida's long history of racially discriminatory voting restrictions that dates back over 100 years." Case No. 201, ECF 1 at ¶ 53. They proceed to detail the obviously discriminatory laws from the 1880's and 1890s without providing facts that link that sordid history to the 2021 Law or those who passed it. *See* Case No. 201, ECF 1 at ¶¶ 54-68.

At best, the relevant historical background alleged in the complaints points to no intentional discrimination. Claims about high Black and Latino use of vote-by-mail ballots in 2020 ask this Court to infer that the Florida Legislature changed the rules because, during *one* election in midst of a global pandemic, more people overall, including Blacks and Latinos, used vote-by-mail ballots; and that Blacks and Latinos in this State form a monolithic voting block that votes against the political party with majorities in the Florida Legislature. *See, e.g.*, Case No. 187, ECF 45 at

¶¶ 2-3; Case No. 201, ECF 1 at ¶¶ 7-8, 120.  Statements about more voters of the minority party using vote-by-mail than the majority party also prove inconsequential because "partisan reasons" fail to provide the requisite historical background for racial intent.  *See Greater Birmingham Ministries*, 992 F.3d at 1326-27.  Citation to past cases fails too because there is no tether to the 2021 Law, some of the cases failed to find racial animus, and others included no resolution of racial discrimination claims.  *See e.g.*, Case No. 187, ECF 45 at ¶¶ 7 n.3, 44-45; Case No. 201, ECF 1 at ¶¶ 64, 67.

3.   <u>Sequence of Events Leading to Passage and Any<br>Procedural and Substantive Departures.</u>

The sequence of events and departures inquiry, as pled, is insufficient. *Arlington Heights* tells us that "[t]he specific sequence of events leading up to the challenged decision also may shed *some* light on the decisionmaker's purposes." 429 U.S. at 267 (emphasis added).  The word "some" means that, even if this Court found significant evidence of unexplainable procedural deviations, this factor alone cannot support a finding of intent.  Regardless, for these two prongs of the *Arlington Heights* test, the two sets of Plaintiff groups attribute most of the sequence of events and departure to a once-in-a-lifetime pandemic.  *See, e.g.*, Case No. 187, ECF 45 at ¶¶ 2-3; Case No. 201, ECF 1 at ¶¶ 7-8, 120.  There is one notable exception:  the claim that the "strike all" amendment was unusual.  *See* Case No. 187, ECF 45 at ¶¶ 63, 67; Case No. 201, ECF 1 at ¶¶ 88-89.  That is not true.  The Florida Legislature

17

used the "strike all" (or "delete all") tool with frequency; in 2021 it was used 359 times on 290 bills, i.e., on 9.4% of all bills during the 2021 Regular Session, and 440 times on 326 bills, i.e., on 9.3% of all bills during the 2020 Regular Session.[9]

4.   Contemporaneous Statements of Key Legislators.

The Plaintiffs also cannot show discriminatory intent through statements of "key legislators" supportive of the 2021 Law "made contemporaneously" with its passage. *Greater Birmingham Ministries*, 992 F.3d at 1322.  At best, key legislators, like Senate Sponsor Baxley, are alleged to have said that "[w]e are doing this bill because it becomes clear as you look across the country that there is a lot of confusion from many people on different fronts."   Case No. 201, ECF 1 at ¶ 78. They are also alleged to have said that the 2021 Law was needed to address "some [issues] going on around the country, different places, and we want to be proactive and prevent things from going awry, rather than waiting to have some kind of

---

[9] This Court may take judicial notice of public records at this stage. *See Universal Express, Inc. v. United States SEC*, 177 Fed. App'x. 52, 53 (11th Cir. 2006) (unpublished) ("Public records are among the permissible facts that a district court may consider."); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).   This information is available from the Florida Legislature's website at https://www.flsenate.gov/Session/Bills/2021?chamber=both&searchOnlyCurrentVersion=True&isIncludeAmendments=False&isFirstReference=True&citationType=FL%20Statutes&pageNumber=1 (last visited Jun. 24, 2021), using the search terms "strike all" and "delete all".

debacle to recover from." *Id.* Statements like these demonstrate a proactive approach in dealing with election regulations—not the intent to discriminate.

5. Foreseeability and Knowledge of Disparate Impact.

As alleged, there is no foreseeability or knowledge of a disparate impact either. This inquiry requires that a disparate effect be both "foreseeable" and "anticipated." *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464-65 (1979). Importantly, "[d]isparate impact and foreseeable consequences, without more, do not constitute a constitutional violation." *Id*. at 464.

The Plaintiffs rely on two types of allegations in support of this prong of the *Arlington Heights* analysis. They rely on statements that amount to no more than legal conclusions; simply saying that there exists a discriminatory impact (without even saying what that impact is) does not make it so. *See, e.g.*, Case No. 187, ECF 45 at ¶¶ 135, 194; Case No. 201, ECF 1 at ¶ 159. Plaintiffs also rely on statements from those opposing the 2021 Law's passage, *see* Case No. 187, ECF 45 at ¶¶ 119-124; Case No. 201, ECF 1 at ¶¶ 73-74; however, legislators are not required to take the word of their political opponents as there was no objective evidence presented of a foreseeable and anticipated impact. *Cf. Crawford*, 553 U.S. at 204 (explaining that neutral "justifications should not be disregarded simply because partisan interests may have" played a role in passing a law); *Greater Birmingham Ministries,*

992 F.3d at 1308, 1327 (noting concerns from political opponents but not giving them credence under the disparate impact analysis).

Notably, there are no allegations that any legislator voting for the 2021 Law "anticipated" there would be a disparate impact.

### 6.   Less Discriminatory Alternatives.

The *Florida Rising* Plaintiffs make no attempt to allege less discriminatory alternatives to the 2021 Law. The Plaintiffs in *NAACP* only make passing conclusory statements concerning the issue, which simply ask for the pre-2021 status quo without alleging why that status quo is less discriminatory. *See* Case No. 187, ECF 45 at ¶¶ 138, 196, 220.

In sum, given the dearth of factual allegations that go to the *Arlington Heights* factors, this Court should dismiss the intentional, racial discrimination claims.

### C.   **This Court should dismiss the discriminatory effect claims under Section 2 of the Voting Rights Act.[10]**

The discriminatory effect claims under Section 2 of the Voting Rights Act fare no better for purposes of Rule 12(b)(6). The Act provides in pertinent part that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which *results* in a denial or

---

[10] Specifically, this Court should dismiss Count I in the *NAACP* case, and Count I in the *Florida Rising* case.

abridgment of the right . . . to vote on account of race or color." 52 U.S.C. § 10301(a) (emphasis added).  The discriminatory result "is established if, based on the *totality of circumstances*, it is shown that" members of a race or color "have less opportunity than other members of the electorate to participate in the political process *and* to elect representatives of their choice."  *Id.* § 10301(b) (emphasis added).  "In other words, the challenged law must have *caused* the denial or abridgement of the right to vote on account of race" to violate Section 2.  *Greater Birmingham Ministries*, 992 F.3d at 1330.  "[D]isparate inconveniences that voters face when voting" are not enough to state a Section 2 claim.  *Id.* (citations and alteration omitted).

In these consolidated cases, neither the *NAACP* Plaintiffs nor the *Florida Rising* Plaintiffs allege that the 2021 Law keeps them from electing candidates of their choice.[11]  This is fatal.  To reiterate, Section 2 provides that a discriminatory result "is established if, based on the *totality of circumstances*, it is shown that" members of a race or color "have less opportunity than other members of the electorate to participate in the political process *and* to elect representatives of their choice."  52 U.S.C. § 10301(b) (emphasis added); *see also Greater Birmingham Ministries*, 992 F.3d at 1329 (same).

---

[11] Both the *NAACP* and *Florida Rising* complaints each contain a single conclusory allegation to electing "representatives of their choice," *see* Case No. 187, ECF 45 at ¶ 133; Case No. 201, ECF 1 at ¶ 153, which amount to no more than "[t]hreadbare recitals of the elements of a cause of action," *Iqbal*, 556 U.S. at 678.

Separately, the complaints include no non-speculative, non-conclusory allegations of discriminatory effect.  The *Florida Rising* complaint states, for example, that "in Pinellas County alone, approximately 28,000 voters lack a driver's license, state ID card, or social security number on file in the voter registration system."  Case No. 201, ECF 1 at ¶ 85.  But this allegation includes no mention of the racial composition of the alleged 28,000 or if the burdens fall disproportionately on Black or Latino voters.  *See id.*  The *NAACP* complaint relies primarily on claims relating to either Florida's (distant) history of racial prejudice or conclusory allegations about increases in minority voters' use of alternative means of voting (during a once-in-a-generation pandemic) in an attempt to make a cognizable claim under the totality of the circumstances.  *See, e.g.*, Case No. 187, ECF 45 at ¶¶ 38-40.  But coupling Florida's distant history and a single data point during a pandemic does nothing to show that "the challenged law . . . *caused* the denial or abridgment of the right to vote *on account* of race."  *Greater Birmingham Ministries*, 992 F.3d at 1330 (second emphasis added).

In sum, the Plaintiffs have not adequately pled a discriminatory result claim under Section 2 of the Voting Rights Act.

**D.**   **This Court should dismiss the vagueness and overbreadth claims against the non-solicitation requirement.**[12]

The Plaintiffs similarly fail to state a claim for purposes of Rule 12(b)(6) when they allege that the 2021 Law violates vagueness and overbreadth doctrines under the First or Fourteenth Amendments, or both, because of its prohibition on "engaging in any activity with the intent to influence or effect of influencing a voter" within "150 feet of a drop box or the entrance to any [in-person] polling place," which also does not apply to nonpartisan assistance from supervisors or their staff.  **Exhibit A** at § 29 (Pg. 24-25).   The *Harriet Tubman* Plaintiffs' argument that the voter-registration disclaimer is void for vagueness because it "does not specify the penalties" for non-compliance also misses the mark.

1.   <u>Non-Solicitation Provision Establishes Reasonably Clear Lines for All to Follow.</u>

A law is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment where it "fails to provide people with ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or because it "authorizes or even encourages arbitrary and discriminatory enforcement."   *Hill v. Colorado*, 530 U.S. 703, 732 (2000).   "[R]easonably clear lines" between proscribed

---

[12] Specifically, this Court should dismiss Count III in the *League of Women Voters* case, Count V in the *NAACP* case, Count V in the *Florida Rising* case, and Count I in the *Harriet Tubman* case.

23

and permitted conduct is all that is required to pass muster under the Due Process Clause. *Smith v. Goguen*, 415 U.S. 566, 574 (1974).

The Plaintiffs assert that Section 29 of the 2021 Law—the non-solicitation provision—is unconstitutionally vague because it fails to draw an absolute line separating proscribed from permitted speech and conduct within the 150-foot zone surrounding polling locations. *See, e.g.*, Case No. 187, ECF 45 at ¶ 180. Their argument hinges on the use of the words "any activity," which the Plaintiffs argue are "necessarily expansive," and that there is therefore effectively no limit to the kinds of activities that may be criminalized within that 150-foot perimeter. *Id.* at ¶ 101. The *NAACP* Plaintiffs allege that Section 29 could criminalize "all activity" within that perimeter, including "possibly, the nonpartisan provision of free food, water, and similar basic resources to voters standing in line." *Id.* at ¶ 114. The *League of Women Voters* Plaintiffs warn that "[t]he possibilities of prohibited activities are *virtually limitless*, ranging from speaking words to a voter to handing them water bottles or food." Case No. 186, ECF 1 at ¶ 166. These arguments do not withstand scrutiny.

The non-solicitation provision's text reveals that it cannot reasonably be interpreted to criminalize "any activity" within the no-solicitation zone—and the Plaintiffs point to no language reasonably prohibiting, *inter alia*, the nonpartisan provision of food or water, or a chair to someone with mobility challenges.

First, contrary to the Plaintiffs' decision to read "any activity" in isolation, the canons of construction mandate that "[w]ords of a statute are not to be interpreted in isolation; rather a court must look to the provisions of the whole law and to its object and policy." *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1363 (Fed. Cir. 2005). When the phrase "any activity" is construed reasonably in context of its surrounding text and the provision as a whole, the text is unambiguous in what it prohibits: partisan efforts of individuals or campaigns to pressure or influence voters' decisions within the no-solicitation zone.

Second, another commonly used linguistic canon confirms that Section 29's meaning is not vague. Specifically, when, as here, general terms or phrases are included in a series of more specific items, the general term should be interpreted to have meaning akin to the more specific surrounding terms and in light of its surrounding provisions, i.e., *noscitur a sociis*.[13] Using the canon, it is apparent that the non-solicitation provision does not in any way prohibit innocent, nonpartisan assistance to voters waiting in line. Instead, the relevant provision targets partisan efforts to influence the decisions of voters near polling locations.

Notably, the "any activity" restriction itself is qualified by the important

---

[13] *See, e.g., Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995); *Beecham v. United States*, 511 U.S. 371 (1994); *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990).

phrase "with the intent[14] to *influence* or effect of *influencing* a voter," demonstrating that the provision does not extend to ordinary, run-of-the-mill activities like innocently giving voters a drink of water—rather, the restriction narrowly targets activities with a reasonable likelihood of swaying a voter's decision on how to vote. **Exhibit A** at § 29 (Pg. 24-25) (emphasis added).

It follows that, while merely giving bottles of water to voters waiting in line would not reasonably be viewed as an activity "with the effect of influencing a voter," if for example the bottles have campaign logos pasted on the front or are supplemented with campaign literature, that obviously transforms the activity into the kind of solicitation the statute prohibits.  Certainly, the Florida Legislature did not need to engage in the unwieldy exercise of spelling out each potential way that individuals or political groups could influence or attempt to influence voters while approaching a polling location—due process does not demand that level of enumeration to prohibit obviously unsuitable conduct in all its various permutations. Nor is that level of detail necessary to guard against the de minimis risk of

---

[14] The U.S. Supreme Court "has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982).  Accordingly, because the non-solicitation provision includes the scienter requirement of "intent to influence . . . a voter," any alleged vagueness that may exist with respect to that restriction is alleviated by the provision's inclusion of a threshold scienter requirement.

inconsistent enforcement.  Instead, because the non-solicitation provision identifies the prohibited conduct through its plain text and clear purpose, the provision is not unconstitutionally vague.

Third, even if the phrase "any activity" *is* vague when viewed in isolation, as Plaintiffs assert, the series of prohibited activities immediately preceding the provision, coupled with its broader context, reveals exactly the kinds of "activities" the statute prohibits, and manifests an unmistakable purpose of prohibiting partisan solicitation near polling locations, defeating Plaintiffs' vagueness arguments.  This is because the relevant "any activity" language comes from the definition of the terms "solicit" and "solicitation" under the provision.   Dictionary definitions confirm that to "solicit" is ordinarily understood to mean to entreat, approach with a request or plea, urge, or entice to action.  *See, e.g.*, *Solicit*, *Merriam-Webster's Dictionary*,  https://www.merriam-webster.com/dictionary/solicit  (last  accessed June 22, 2021).  Importantly, the word does not ordinarily include aiding or assisting someone as Plaintiffs allege, unless such assistance is intended or reasonably has the effect of influencing voters to change their vote. The items included in the non-solicitation provision's list of prohibited actions preceding the provision at issue here bolsters this interpretation. They include:

> seeking or attempting to *seek any vote*, fact, opinion, or contribution; distributing or attempting to distribute any *political or campaign material, leaflet, or handout*; conducting a *poll* . . . seeking or attempting to seek a *signature on any petition*; selling or attempting to

sell any item; and engaging in any activity with the intent to *influence*
or effect of influencing a voter.

**Exhibit A** at § 29 (Pg. 24-25) (emphasis added). Plaintiffs' complaints largely
ignore this list of activities, presumably because it is fatal to their vagueness
argument: viewed in its proper context, the "any activity" provision does not
reasonably mean what Plaintiffs assert it could mean, nor is it vague. Instead, it is
surrounded by a list of activities that include requesting votes, campaigning,
distributing literature, and signature gathering for petitions—the statutory purpose
is thus clear. Legislatures are presumed to not "hide elephants in mouseholes."
*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), which is exactly what
the Plaintiffs ask this Court to do: they aim to expand the potential statutory meaning
of "any activity" to prohibit a whole host of nonpolitical activities and assistance
that are of a fundamentally different scope and character from the list of items
immediately preceding that phrase. This Court should reject this effort to go well
beyond what the statutory text and purpose reasonably indicate.

Finally, contrary to Plaintiffs' foreboding, the carveout for supervisors'
volunteers and employees bolsters the Secretary's interpretation because it confirms
the exact kinds of activities the statute permits and thus does not aim to restrict:
"providing *nonpartisan* assistance to voters within the no-solicitation zone such as,
but not limited to, giving items to voters." **Exhibit A** at § 29 (Pg. 25). Restricting
assistance within the zone to nonpartisan activities again bolsters Defendant's

argument that the legislature was primarily concerned with restricting *partisan* activities, as evidenced by the kinds of activities prohibited by the previous clauses.

In sum, because Section 29's solicitation provision is not susceptible to the interpretations put forth by Plaintiffs, and given the U.S. Supreme Court's reluctance to declare statutes void for vagueness generally, *see Parker v. Levy*, 417 U.S. 733, 757 (1974), the Plaintiffs' vagueness claims should be dismissed.

> 2.   Third-Party Registration Disclaimer Establishes Reasonably Clear Lines.

The *Harriet Tubman* Plaintiffs' challenge to the voter-registration disclaimer on vagueness grounds fails too. They argue that the disclaimer requirements do not "specify the penalties." Case No. 242, ECF 1 at ¶ 87. But there is a specific penalty.

Section 7 of the 2021 Law specifies in 97.0575(3)(a) that "the aggregate fine pursuant *to this paragraph* which may be assessed against a third-party voter registration organization, including affiliate organizations, for violations committed in a calendar year is $1,000." **Exhibit A** at § 7 (Pg. 9) (emphasis added). That "paragraph" as amended includes the relevant disclaimer requirement that a "third-party voter registration organization must notify the applicant at the time the application is collected that the organization might not deliver the application to the division or the supervisor of elections in the county in which the applicant resides in less than 14 days." *Id.* (Pg. 8). There is nothing vague about the consequences to third-party voter registration organizations for non-compliance; again, the aggregate

maximum annual penalty explicitly established by statute for noncompliance is $1,000. *Id.* at § 7 (Pg. 8-9). Period.[15] *See Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1311-12 (11th Cir. 2009) (holding potential defendants "have notice of the consequences of violating [the statute] because it clearly defines what conduct is prohibited and the potential range of fine that accompanies noncompliance").

### 3.   The Overbreadth Claims Also Fail.

The First Amendment's[16] overbreadth doctrine prohibits regulation of substantially more protected speech than is necessary to achieve regulatory purposes. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). A regulation's overbreadth "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id*. at 615. Overbreadth is, however, a "manifestly[] strong medicine" sparingly employed by courts "only as a last resort,"

---

[15] The *Harriet Tubman* Plaintiffs' separate concern that the statute does not identify whether "individual volunteers would face consequences for a violation under the law," Case No. 242, ECF 1 at ¶ ¶ 87, is also unavailing because Section 7 only permits assessment of the aggregate fine "against a third-party voter registration organization." **Exhibit A** at § 7 (Pg. 9) Far from being void for vagueness, the statute is clear that individual volunteers, including for such organizations, are not subject to penalties at all.

[16] In the Fourteenth Amendment context, the overbreadth doctrine is simply not applied. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) ("[W]e have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."); *Schall v. Martin*, 467 U.S. 253, 268 n.18 (1984) ("[O]utside the limited First Amendment context, a criminal statute may not be attacked as overbroad.").

*id.* at 613, meaning that "facial overbreadth adjudication is an exception" to the U.S. Supreme Court's "traditional rules of practice," *id.* at 615.  Consequently, statutes should not be invalidated based on facial overbreadth whenever "a limiting construction has been or could be placed on the challenged statute." *Id.* at 613; *see also United States* v. *Thirty-seven Photographs*, 402 U.S. 363 (1971).

The U.S. Supreme Court's First Amendment precedents permit state governments to create so-called "nonpublic forums" where the government has significant flexibility to establish rules limiting speech, *Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46-49 (1983), and which the government "may reserve . . . for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression" merely because of government opposition to the speaker's viewpoint, *id.* at 46. Courts thus routinely uphold speech restrictions at nonpublic forums like polling places as constitutional because they qualify as "government-controlled property set aside for the sole purpose of voting." *Minn. Voters Alliance v. Mansky,* 138 S. Ct. 1876, 1885-86 (2018); *see also Burson v. Freeman,* 504 U.S. 191, 193-94 (1992).  Accordingly, the government "may impose some content-based restrictions on speech in nonpublic forums [like polling locations], including restrictions that exclude political advocates and forms of political advocacy." *Mansky*, 138 S. Ct. at 1885-86.

The Plaintiffs' complaints hardly rise to the level of the exceptional kind of

31

claims or "last resort," *Broadrick*, 413 U.S. at 613, that would justify invoking the overbreadth doctrine.  Far from prohibiting substantially more speech than the Constitution permits, the complaints do not describe restrictions on protected speech at all. This is fatal to the overbreadth claim and warrants dismissal.

First, as described in the above analysis of vagueness, the 2021 Law does not prohibit the kinds of activities that Plaintiffs allege.  Contrary to Plaintiffs' allegations, the non-solicitation provision does not infringe on the "legal and constitutional right of volunteers to engage in expressive conduct by offering food, water, chairs, or other relief to voters" or the "right of voters to receive such assistance,"[17] Case No. 187, ECF 45 at ¶ 182.  Even if the non-solicitation provision does prohibit expressive conduct as the Plaintiffs allege, that speech would still not be protected from regulation because the statute clearly regulates polling locations, which are nonpublic forums subject to content-based speech restrictions, including political advocacy prohibitions.  *See Mansky*, 138 S. Ct. at 1885-86.  The statute plainly targets partisan activities with the intent or "effect of influencing a voter," which is essentially identical to political advocacy that the Supreme Court has said

---

[17] This assumes that voters have a constitutional right to *receive* food, water, chairs, etc. in the first place while waiting in a public line to vote, which is conjectural at best.  But even if such a constitutional right did exist, it would not be pursuant to the First Amendment, which means the overbreadth doctrine would not be applicable. *Salerno*, 481 U.S. at 745 ("[W]e have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment.").

may be restricted in polling locations.  *See id.*  Thus, no matter how Plaintiffs frame it, the result is the same: the overbreadth doctrine is entirely inapplicable to the non-solicitation provision.

Lastly, the *League of Women Voters* Plaintiffs' complaint suffers from a separate but equally problematic defect:  it fails to provide a single statement (much less factual allegations) in support of its contention that the non-solicitation provision is unconstitutionally overbroad, and instead merely states that "the line warming ban is . . . overbroad under the First Amendment to the U.S. Constitution." Case No. 186, ECF 1 at ¶ 169.  If ever there were an "unadorned" allegation, *Iqbal*, 556 U.S. at 678, that fails to provide any "grounds" for "entitlement to relief," *Twombly*, 550 U.S. at 555, this pure conclusory statement is it.

In sum, the overbreadth allegations must also be dismissed as a matter of law for failure to state a claim.

### E.   This Court should dismiss the ADA claim, at least with respect to the Secretary.[18]

As the only Plaintiffs alleging ADA violations in this action, the *NAACP* Plaintiffs fail to state a claim under which relief could be granted pursuant to Title II of the ADA.  The *NAACP* Plaintiffs challenge four distinct provisions from the 2021 Law: (1) Section 28's in-person monitoring requirement for drop boxes; (2)

---

[18] Specifically, this Court should dismiss Count III of the *NAACP* complaint.

Section 32's ballot collection limit; (3) the vote-by-mail application renewal requirement; and (4) Section 29's polling place solicitation prohibition.  Case No. 187, ECF 45 at ¶ 164.  Each of these allegations fail, as explained further below.

1.   The Plaintiffs Lack Standing to Sue the Secretary.

As a threshold matter, the *NAACP* Plaintiffs lack standing to bring their ADA claims against the Secretary.  The Eleventh Circuit decision in *Jacobson* is instructive on this point.  There, the Eleventh Circuit held that the plaintiffs lacked standing to sue the Secretary when challenging Florida's ballot order statute "because any injury would be neither traceable to the Secretary nor redressable by relief against her."  974 F.3d at 1253.  The Eleventh Circuit explained that "[t]o satisfy the causation requirement of [Article III] standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'"  *Id.* (citations omitted).  According to the Eleventh Circuit, the general statutory provisions concerning the Secretary's role as chief election officer failed to provide the necessary causal link to the challenged action; furthermore, county Supervisors of Elections acted as independent constitutional officers responsible for implementing the State's election laws.  *Id.*  Because any alleged injury stemming from a ballot order statute was attributable, if at all, to the Supervisors, the *Jacobsen* plaintiffs lacked standing to sue the Secretary.  *Id.*

The same is true for the *NAACP* Plaintiffs' ADA claims against the Secretary. The *NAACP* Plaintiffs fail to link the Secretary to any of the injuries they allege and the relief they seek, as *Jacobson* required them to do.  *Id.*  For instance, regarding the complaint's allegation that the 2021 Law's in-person monitoring requirement of drop boxes violates the ADA, the *NAACP* pleads no facts showing the Secretary's involvement or causation of the alleged harms.  The complaint alleges (with a high degree of speculation) that because of this staffing requirement, "many election officials will place most or all drop boxes indoors," making them allegedly less accessible to voters with disabilities.  Case No. 187, ECF 45 at ¶ 159.  The *NAACP* Plaintiffs also assert that due to Section 29's polling place solicitation prohibition, family members, caregivers, and others will be inhibited from providing food, water, or a chair to voters with disabilities.  *Id.* at ¶ 161.  Yet failures to provide reasonable accommodations for disabled voters returning absentee ballots or for voting in-person trigger responsibilities squarely within the purview of the State's 67 supervisors of elections.  *Cf. Jacobson*, 974 F.3d at 1253.  The same is true for any restrictions imposed on those interacting with voters in voting lines because the supervisors must manage lines at their respective polling places.

The *NAACP* Plaintiffs similarly fail to plead facts explaining how alleged injuries stemming from the enforcement of either the ballot collection limit or mail-in-ballot application renewal requirement are attributable to the Secretary. Case No.

187, ECF 45 at ¶¶ 160, 164.  Again, the *NAACP* Plaintiffs ignore that the Supervisors are independent officials under Florida law responsible for implementing these laws and who "are not subject to the Secretary's control," *Jacobson*, 974 F.3d at 1253, which means injuries arising from such enforcement would not be fairly traceable to the Secretary.  As the Eleventh Circuit determined regarding the ballot order statute in *Jacobson*, the Supervisors and other local officials are not agents of the Secretary and are not bound by judgments against the Secretary, persuasive as any judgments might be on an issue. *See id*. at 1253-54.  Pointing to the Secretary's role as the "chief election officer of the state," Case No. 187, ECF 45 at ¶ 25, is insufficient to establish a causal connection between the Secretary and Plaintiffs' alleged injuries.

Absent any factual allegations tying the Secretary to the injuries alleged here, Plaintiffs lack standing to bring these ADA claims against the Secretary.  At a minimum, these claims against the Secretary must be dismissed under Rule 12(b)(1). *See, e.g.*, *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 811 (11th Cir. 1993).

## 2.   Regardless, the Plaintiffs Fail to State a Claim.

Even if the *NAACP* Plaintiffs did have standing to sue the Secretary, they still fail to state a claim for relief under Title II of the ADA.  Such a claim requires the plaintiff to allege and then prove "(1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of a

public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Am. Ass'n of People with Disabilities v. Harris*, 647 F.3d 1093, 1101 (11th Cir. 2011) (quoting *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1081 (11th Cir. 2007)); *see also* 42 U.S.C. § 12132.   Importantly, the ADA does not mandate the use of any particular technology or any specific accommodation, so long as every individual has "an opportunity to participate in and benefit from the aid, benefit or service that is . . . equal to that afforded others."  *See* 28 C.F.R. § 35.130(b)(1)(ii)-(iii); *see also* 45 C.F.R. § 84.4(b)(1)(ii)-(iii).  Because the 2021 Law does not exclude or deny the opportunity for voters with disabilities to equally participate in voting, deny them the benefits of public voting services, or discriminate against voters because of their disability, this Court should dismiss the ADA claim as outlined below.

### i.      In-Person Drop Box Monitoring

The *NAACP* Plaintiffs contend that Section 28's requirement that drop boxes be "monitored in person by" a Supervisor's employee at all times adds "impermissible barriers to voters with disabilities' participation in elections" by "severely curtail[ing]" their access to easily accessible outdoor drop boxes.  Case No. 187, ECF 45 at ¶¶ 79, 81, 159.  To support this assertion, the *NAACP* speculates that a result of the staffing requirement will be that "many election officials will

place most or all drop boxes indoors where staff are already located, which may be less accessible to voters with disabilities." *Id.* ¶ 159.  The *NAACP* Plaintiffs fail to plead facts that, taken as true, show how the in-person monitoring requirement of drop boxes excludes or denies individuals with disabilities equal access to voting via drop box, much less discriminates against individuals with disabilities.

The *NAACP* Plaintiffs' instead ask the Court to infer three layers of speculation to support their claim.  First, they ask the Court to infer that "many election officials" will opt to move their drop boxes indoors in response to Section 28's in-person staffing requirement.  Case No. 187, ECF 45 at ¶ 159.  Second, they then infer that, as a result, some drop boxes "may" be less accessible to voters with disabilities because of the boxes' likely placement indoors.  *Id.*  Third, they infer that the indoor spaces—the buildings—will themselves be inaccessible contrary to the requirements of the ADA, again without factual support.  *See id*.  Thus, far from pleading concrete facts capable of showing an ADA violation, this argument "piles speculation upon speculation," which is not enough.  *D.C. ex rel. Walker v. Merck & Co. (In re Vioxx Prods. Liab. Litig.)*, 874 F. Supp. 2d 599, 609 (E.D. La. 2012).[19]

---

[19] Even if the *NAACP* Plaintiffs' concerns regarding what may transpire in the future as a result of Section 28 qualify as factual allegations for purposes of Rule 12(b)(6), these allegations are not ripe because they are mere "speculation about contingent future events," *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995), meaning they are not "fit for adjudication," *Pittman v. Cole*, 267 F.3d 1269, 1278 (11th Cir. 2001) (quotation omitted), thus separately justifying dismissal. *See Texas v. United States*,

ii.     *Limitations on Ballot Collection*

The *NAACP* Plaintiffs' allegation that restrictions on ballot collection will disenfranchise voters with disabilities is also speculative and inadequate to state a claim for relief under Title II of the ADA.  The *NAACP* Plaintiffs assert that "[m]any voters with disabilities rely exclusively on caregivers and other non-family members to collect and return their VBM ballots, as do many elderly voters and voters with disabilities who live in group facilities in which staff collect and return VBM ballots on behalf of residents."  Case No. 187, ECF 45 at ¶ 92.  The theory goes that any limitation on returning ballots would therefore serve as a "significant barrier to the franchise for voters with disabilities" and "lead to outright disenfranchisement as they may be unable to find anyone to submit their ballots for them." *Id.* ¶ 160.

As an initial matter, however, the suggestion that the 2021 Law negatively impacts the ability of "elderly voters and voters with disabilities who live in group facilities" to deliver their absentee ballots, *see id.* ¶ 92, is directly contradicted by the statutory text.  There is an express carve-out for "supervised voting at assisted living facilities and nursing home facilities as authorized under section 101.655 [of

---

523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (citation omitted); *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997) ("The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes.").

the Florida Statutes].” **Exhibit A** at § 32 (Pg. 27).

Additionally, besides obvious problems with the *NAACP* Plaintiffs' speculation that individuals with disabilities "may" not be able to find anyone to submit their ballots for them, Case No. 187, ECF 45 at ¶ 160, including ripeness concerns, *see Cheffer*, 55 F.3d at 1524, the provision includes numerous potential avenues for third parties, including non-family volunteers, to deliver ballots for voters who are homebound or cannot risk exposure to crowds.  First, the alleged risk of "outright disenfranchisement," Case No. 187, ECF 45 at ¶ 160, is unsupported because, even for homebound voters, mailing in a ballot remains accessible, just as it is for millions of voters who elect to mail in their ballots each election cycle. Second, beyond using the mail, the provision places no limit on the number of ballots that a voter's immediate family members (which includes grandchildren, siblings, or even immediate family members of the voter's *spouse*, **Exhibit A** at § 32 (Pg. 27)) can deliver to drop boxes for each other during an election cycle.  Third, beyond delivery by an immediate family member, the statute also permits *any* third party to deliver the voter's ballot, including caregivers and volunteers, as long as that third party has not delivered more than two vote-by-mail ballots during that election cycle in addition to his or her own ballot.  *Id.*

In sum, Florida's limitations on ballot collection are carefully and practically crafted to target and eliminate the use of mass ballot harvesting, while leaving open

ample reasonable alternative avenues for voters with disabilities to vote without restriction, including through third-party delivery to a drop box if they prefer. The claim that this law "will lead to outright disenfranchisement" is simply unfounded and without factual support. It should therefore be dismissed.

### iii.    Vote-by-Mail Renewal

The *NAACP* Plaintiffs offer minimal to no support for their contention that the requirement to renew vote-by-mail application requests each general election cycle (every 2 years), rather than every two general election cycles (every 4 years), as it was previously, denies Plaintiffs' rights protected by the ADA. *See* Case No. 187, ECF 45 at ¶ 164. The only fact alleged for this assertion is a short, conclusory statement that this requirement will "impose new burdens on many voters with disabilities, who will be forced to contend with the logistical challenges of completing a VBM ballot request twice as often." *Id.* at ¶ 94. This type of formulaic, "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements," is inadequate to state a claim for relief because it fails to explain the degree to which voters with disabilities will be burdened whether through logistical challenges or otherwise. *Iqbal*, 556 U.S. at 678.

### iv.    Non-Solicitation Requirement

The *NAACP* Plaintiffs also make the inaccurate assertion that the non-solicitation provision inhibits family members, caregivers, volunteers, and others

"from providing food or water to a voter with diabetes, or a chair to someone with limited mobility or breathing problems," and thus may expose these individuals to "potential liability for aiding . . . voters with disabilities," resulting in some voters with disabilities "having to choose between their health and casting their vote." Case No. 187, ECF 45 at ¶ 161. As discussed above, this interpretation of the 2021 Law is erroneous and distortive. Correctly interpreted, the statute tailors its *solicitation* prohibition to engaging in any partisan or campaign activities within 150 feet of polling places "with the intent to *influence* or effect of *influencing* a voter." **Exhibit A** at § 29 (Pg. 24-25). Nowhere does the statute prohibit Good Samaritans or volunteers from extending a helping hand to voters with disabilities, nor does it prohibit such voters from being accompanied by a family member, caregiver, etc., within the 150-foot zone, as long as that assistance is not done in a partisan manner to sway a voter's decision of how to vote.

Even if the erroneous but expansive interpretation of the non-solicitation requirement were correct, the argument still fails because the 2021 Law allows for "an employee of, or a volunteer with, the supervisor" to provide "nonpartisan assistance to voters within the no-solicitation zone such as, but not limited to, giving items to voters . . . ." *Id.* (Pg. 25). Thus, without pleading facts showing why a supervisor's employees or volunteers would be unable or unwilling to provide needed help to voters with disabilities who request assistance inside the 150-foot

zone, they still fail to state a claim that Section 32 does not provide reasonable accommodations for voters with disabilities, or that such voters would be excluded or denied the benefits of participation in in-person voting, or otherwise discriminated against based on the voters' disabilities. *Cf. Harris*, 647 F.3d at 1101.

In sum, because the *NAACP* Plaintiffs fail to state a claim of any failure of the 2021 Law to provide reasonable accommodations for voters with disabilities, its ADA claims must be dismissed.

**F.    This Court should dismiss the claims under Section 208 of the Voting Rights Act.[20]**

Claims that Section 208 of the Voting Rights Act preempts the 2021 Law because the Florida law allegedly "criminalize[s] the provision of assistance to voters with disabilities," Case No. 187, ECF 45 at ¶ 228, should also be dismissed.

1.    The Plaintiffs Lack Standing to Sue the Secretary.

As with the ADA claims, this Court should dismiss under Rule 12(b)(1) the Section 208 claims against the Secretary because the Plaintiffs fail to "clearly . . . allege facts demonstrating" that they have standing. *Warth*, 422 U.S. at 518.

Specifically, neither the *Florida Rising* nor the *NAACP* Plaintiffs provide a single factual contention showing that the alleged Section 208 violations are fairly

---

[20] Specifically, this Court should dismiss Count IX in the *NAACP* case and VI in the *Florida Rising* case.

43

traceable to the Secretary.  For instance, the *Florida Rising* Plaintiffs claim (without support) that the 2021 Law prevents a volunteer from providing requested language assistance to voters needing assistance at the polls.  *See* Case No. 201, ECF 1 at ¶¶ 195.  Yet nothing is pled explaining the Secretary's involvement in such (in)actions, or how the causal element is satisfied for purposes of standing.  *See id.* This omission serves as a tacit admission of the fact that supervisors of election supervise lines at the poll—not the Secretary.  The *NAACP* Plaintiffs' complaint suffers from similar deficiencies, *see* Case No. 187, ECF 45 at ¶¶ 224-28.  Because Plaintiffs fail to link the Secretary to the injuries they allege and the relief they seek under Section 208, their Section 208 claims against the Secretary must be dismissed for lack of standing.  *See Jacobson*, 974 F.3d at 1253.

### 2.   There is no Private Cause of Action.

Separately, and equally fatal to Plaintiffs' Section 208 claim, Section 208 does not provide a private right of action.  The Voting Rights Act contains many sections dedicated to a remedial scheme to enforce its provisions.  Some provisions are enforceable by the U.S. Attorney General, *see, e.g.*, 52 U.S.C. § 10504, and some provisions are enforceable by private litigants, *see, e.g.*, 52 U.S.C. § 10302(a). Section 208 contains no remedial scheme whatsoever. 52 U.S.C. § 10508.

The U.S. Supreme Court has articulated a four-part test to determine if a "private remedy is implicit in a statute not expressly providing one." *Cort v. Ash*,

422 U.S. 66, 78 (1975).  "First, is the plaintiff one of the class for whose especial benefit the statute was enacted, that is, does the statute create a federal right in favor of the plaintiff?"  *Id.* (internal quotation and citation omitted).  "Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?"  *Id.*  "Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?"  *Id.*  "And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?"  *Id.*  "The Supreme Court has cautioned the judiciary to exercise restraint in implying a private right of action, and required that affirmative evidence of congressional intent to create a private remedy must exist."  *McCulloch v. PNC Bank, Inc.,* 298 F.3d 1217, 1222 (11th Cir. 2002).

In this case, as an initial matter, the Plaintiffs are not the class of individuals that Congress contemplated in enacting Section 208 because none of them have had their right to receive necessary voting assistance unduly burdened by the series of speculative (and in many cases improbable) events they allege may take place in some future election.  Second, although Congress's intent in Section 208 certainly was to allow needed assistance to voters who are disabled, blind, or illiterate, *see, e.g.*, JoNel Newman, *Ensuring That Florida's Language Minorities Have Access to The Ballot*, 36 Stetson L. Rev. 329, 354 (2007), the Plaintiffs provide no affirmative

evidence of congressional intent to create a private remedy under Section 208. To the contrary, the legislative scheme as a whole demonstrates that Congress did not intend to create a private right of action: Congress unambiguously created private rights of action in various other sections of the Voting Rights Act but conspicuously excluded it from Section 208. Obviously then, "when Congress wished to provide a private [] remedy, it knew how to do so and did so expressly," counseling strongly against this Court "imply[ing] a private remedy," *Touche Ross & Co. v. Redington*, 442 U.S. 560, 571-72 (1979) (refusing to imply a private right of action under Section 17(a) of the Securities Exchange Act of 1934). By declining to do so under Section 208, Congress demonstrated that its intent was to *not* provide a private remedy—inferring a right of action in spite of this weighty evidence would fly in the face of the Supreme Court's admonition to exercise restraint in implying a private right of action, *McCulloch*, 298 F.3d at 1222. And fourth, because the U.S. Constitution gives states the power to regulate elections, *see Sugarman v. Dougall*, 413 U.S. 634, 647 (1973), regulation of absentee ballots and polling locations is a function traditionally relegated to state law, further counseling against inferring a cause of action based solely on federal law. *Cort*, 422 U.S. at 78.

### 3.   Section 208 Does Not Preempt Florida Law.

Turning to the merits, Section 208 provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may

be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union."   52 U.S.C. § 10508.  Conflict preemption exists where a party's "compliance with both federal and state regulations is a physical impossibility," or where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citations omitted).  The Eleventh Circuit has affirmed its presumption of non-preemption when a state acts "in a field which the States have traditionally occupied," rooted in the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Fla. E. Coast Ry. v. City of W. Palm Beach*, 266 F.3d 1324, 1328 (11th Cir. 2001) (citation omitted).

As the Senate Report's discussion of Section 208 states regarding its objectives and the issue of preemption of state legislation:

> The Committee recognizes the legitimate right of any State to establish necessary election procedures, subject to the overriding principle that such procedures shall be designed to protect the rights of voters. State provisions would be preempted *only to the extent* that they *unduly burden the right recognized in this section*, with that determination being a practical one dependent upon the facts.

S. Rep. No. 417, 97th Cong., 2d Sess. at 62-63 (emphasis added).  Because regulating elections is a quintessential area of traditional state regulation, the Plaintiffs must overcome a strong presumption against preemption.  They cannot.

47

The Plaintiffs' complaints fail to plead sufficient facts to show that Section 32's limitation on ballot collection or Section 29's non-solicitation provision unduly burdens the rights of disabled voters requiring assistance to receive assistance by a person of the voter's choice. Again, the Plaintiffs' reading of the non-solicitation "criminaliz[ing] assistance from a friend, non-immediate family member, or non-partisan volunteer in the form of a chair, water, food, or medication provided to a voter with disabilities" is a wildly expansive interpretation divorced from the statutory text's actual limited prohibition of "solicitation" activities. Case No. 187, ECF 45 at ¶ 226. So, there is no conflict whatsoever with the demands of Section 208 of the Voting Rights Act.

The same is true for the limitation on ballot collection. Compliance with Florida law does not "unduly burden" the right to be given assistance by a person of the voter's choosing because having a ballot delivered to a drop box is not assistance that is *necessary* to vote in the first place—using the mail remains a perfectly feasible alternative for homebound voters. In any event, the provision does not make compliance with Section 208 "impossible." *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 780 (8th Cir. 2009); *see also* 52 U.S.C. § 10508 (requiring assistance by "a person of the voter's choice," not assistance by the voter's *first* or even *preferred* choice).

Because Plaintiffs fail to state a claim of conflict preemption under Section 208, and because Section 208 does not provide for a private cause of action, Plaintiffs' Section 208 claim must be dismissed.

## IV.   <u>Conclusion</u>

For the foregoing reasons, this Court should grant the Secretary's Motions to Dismiss in the four cases pending before this Court.

Respectfully submitted by:

BRADLEY R. MCVAY (FBN 79034)
General Counsel
Brad.McVay@dos.myflorida.com
ASHLEY E. DAVIS (FBN 48302)
Deputy General Counsel
Ashley.Davis@dos.myflorida.com
Florida Department of State
R.A. Gray Building Suite 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
Phone: (850) 245-6536
Fax: (850) 245-6127


*/s/ Mohammad Jazil*
MOHAMMAD O. JAZIL (FBN 72556)
mjazil@holtzmanvogel.com
GARY V. PERKO (FBN 855898)
gperko@holtzmanvogel.com
HOLTZMAN VOGEL BARAN TORCHINSKY
& JOSEFIAK, PLLC
2300 N. Street N.W., Ste. 643-A
Washington, D.C. 20037
Phone: (202) 737-8808
Fax: (540) 341-8809

Dated:  June 25, 2021

## NORTHERN DISTRICT OF FLORIDA
## LOCAL RULE 7.1 CERTIFICATION

Pursuant to Local Rule 7.1(D), a conference was not conducted as the relief requested herein will determine the outcome of several of Plaintiffs' claims.

## LOCAL RULE 7.1(F) CERTIFICATION

Pursuant to Local Rule 7.1(F), the attached Omnibus Memorandum in Support of the Secretary's Motions to Dismiss contains 11,907 words, excluding the case style, signature block, and any certificate of service.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served

to all counsel of record through the Court's CM/ECF system on the 25th of June,

2021.


/s/ *Mohammad Jazil*
Attorney for Defendant Secretary Lee