## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

HARRIET TUBMAN FREEDOM
FIGHTERS, CORP.; HEAD COUNT, INC.;
PARALYZED VETERANS OF AMERICA
FLORIDA CHAPTER; PARALYZED
VETERANS OF AMERICA CENTRAL
FLORIDA CHAPTER; STEVE KIRK, and
PHYLLIS RESNICK,

       *Plaintiffs*,

v.

LAUREL LEE, in her official capacity as
Secretary of State of Florida; ASHLEY
MOODY, in her official Capacity as Florida
Attorney General; LISA LEWIS, in official
capacity as Volusia County Supervisor of
Elections; CHRISTINA WHITE, in official
capacity as Miami-Dade County Supervisor of
Elections; KAITI LENHART, in official
capacity as Flagler County Supervisor of
Elections; MIKE HOGAN, in official capacity
as Duval County Supervisor of Elections;
JOSEPH R. MORGAN, in official capacity as
Wakulla County Supervisor of Elections;
MARY JANE ARRINGTON, in official
capacity as Osceola County Supervisor of
Elections; BILL COWLES, in official capacity
as Orange County Supervisor of Elections;
LORI SCOTT, in official capacity as Brevard
County Supervisor of Elections; TOMMY
DOYLE, in official capacity as Lee County
Supervisor of Elections; MAUREEN BAIRD,
in official capacity as Citrus County
Supervisor of Elections; JANET H. ADKINS,

**AMENDED COMPLAINT**

Civil Action No. 4:21-cv-242
Consolidated with:
Case No. 4:21-cv-186
Case No. 4:21-cv-187
Case No. 4:21-cv-201

1

in official capacity as Nassau County
Supervisor of Elections; TOMI S. BROWN, in
official capacity as Columbia County
Supervisor of Elections; CHRIS MILTON, in
official capacity as Baker County Supervisor
of Elections; LAURA HUTTO, in official
capacity as Hamilton County Supervisor of
Elections; HEATH DRIGGERS, in official
capacity as Madison County Supervisor of
Elections; JENNIFER H. KINSEY, in official
capacity as Suwanee County Supervisor of
Elections; CHRIS H, CHAMBLESS, in
official capacity as Clay County Supervisor of
Elections; VICKY OAKES, in official
capacity as St. Johns County Supervisor of
Elections; AMANDA SEYFANG, in official
capacity as Bradford County Supervisor of
Elections; ALEX HAYS, in official capacity
as Lake County Supervisor of Elections;
PAUL A. LUX, in official capacity as
Okaloosa County Supervisor of Elections;
WILLIAM KEEN, in official capacity as
Sumter County Supervisor of Elections;
WESLEY WILCOX, in official capacity as
Marion County Supervisor of Elections; JOE
SCOTT, in official capacity as Broward
County Supervisor of Elections; MARK
EARLEY, in official capacity as Leon County
Supervisor of Elections; MARK ANDERSEN,
in official capacity as Bay County Supervisor
of Elections; KIM BARTON, in official
capacity as Alachua County Supervisor of
Elections; VICKI DAVIS, in official capacity
as Martin County Supervisor of Elections;
SHARON CHASON, in official capacity as
Calhoun County Supervisor of Elections;
DAVID H. STAFFORD, in official capacity
as Escambia County Supervisor of Elections;
TAPPIE A. VILLANE, in official capacity as
Santa Rosa County Supervisor of Elections;

GERTRUDE WALKER, in official capacity
as St. Lucie County Supervisor of Elections;
CONNIE SANCHEZ, in official capacity as
Gilchrist County Supervisor of Elections;
CHRISTOPHER ANDERSEON, in official
capacity as Seminole County Supervisor of
Elections; LESLIE R. SWAN, in official
capacity as Indian River County Supervisor of
Elections; WENDY LINK, in official capacity
as Palm Beach County Supervisor of
Elections; CRAIG LATIMER, in official
capacity as Hillsborough County Supervisor of
Elections; PENNY OGG, in official capacity
as Highlands County Supervisor of Elections;
PAUL A. STAMOULIS, in official capacity
as Charlotte County Supervisor of Elections;
RON TURNER, in official capacity as
Sarasota County Supervisor of Elections;
SHIRLEY ANDERSON, in official capacity
as Hernando County Supervisor of Elections;
and JOYCE GRIFFIN, in official capacity as
Monroe County Supervisor of Elections,

     *Defendants*.

Plaintiffs Harriett Tubman Freedom Fighters, Corp. and Head Count, Inc. (together, "Civic Engagement Plaintiffs"), Paralyzed Veterans of America Florida Chapter, Paralyzed Veterans of America Central Florida Chapter, (together, "PVA Plaintiffs"), Stephen Kirk, and Phyllis Resnick (together "individual Plaintiffs') (collectively, "Plaintiffs") bring this action against Laurel Lee, in her official capacity as Secretary of the State of Florida, ᐧAshley Moody, in her official capacity as Attorney Generalᐧ of the State of Florida, and the Supervisors of

Elections for the Florida Counties where Plaintiffs vote by mail (collectively, "Defendants"), and allege the following:

## **INTRODUCTION**

1.     This lawsuit is about whom voters trust to help them as they register to vote, cast their ballots, and participate in the democratic process—especially voters from communities historically excluded from the franchise or targeted for discrimination by government officials—and limitations on the government's power to insinuate itself between these voters and the organizations and individuals in whom they have invested that trust.

2.     With respect to voter registration, this action challenges Florida's attempt to compel Civic Engagement Plaintiffs to convey a government message which undermines the organizations' own private speech and associational activity by compelling these speakers to denigrate their own efforts to promote political association and participation, in violation of the First and Fourteenth Amendments.

3.     The right to vote is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). Moreover, "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections." H.R. Rep. 103-9 (1993). Such registration laws "disproportionately harm voter participation by various groups, including the disabled and racial minorities." *Id.*

4.     Civic Engagement Plaintiffs' voter registration efforts are "core political speech" involving "interactive communication concerning political change." *Meyer v. Grant*, 486 U.S. 414, 422 (1988). Their endeavors to assist others in registering to vote are themselves political and philosophical statements, signaling that they value the democratic process and believe in the capacity of the popular will to shape the composition and direction of the government.

5.     Governor Ron DeSantis signed Senate Bill 90 into law ("SB 90") on May 6, 2021. Section 7 of SB 90 modified Florida Statute Section 97.0575, pertaining to third-party voter registration organizations ("3PVROs"). The modified statute now requires 3PVROs to warn voter registration applicants, at the point where the applicant entrusts their application to the organization, that they may not timely submit applicants' registration applications and to inform them "how to register online with the [state] division [of elections]."

6.     This inaccurate "warning" ignores that Civic Engagement Plaintiffs make and/or will make every effort to timely submit registration applications in furtherance of their missions and compels them and other non-governmental organizations, their staff, and their volunteers who assist Floridians to register to vote to issue a self-denigrating, misleading, and contradictory warning to a voter registration applicant when they accept an application for the purpose of submitting it to election officials on the applicant's behalf.

7.    In so doing, SB 90 obstructs Civic Engagement Plaintiffs' efforts to associate with potential voters. SB 90 also interferes with voters' opportunity to register, impedes Civic Engagement Plaintiffs' participatory messages and missions, interferes with Plaintiff organizations and their associated individuals' constitutionally protected, core political speech. Furthermore, SB 90 forces Civic Engagement Plaintiffs to adhere to new requirements and implement operational changes that will render their voter registration activities more costly and resource-intensive and less effective.

8.    Encouraging volunteers to participate in voter registration activity is also an important part of the Civic Engagement Plaintiffs' associational activity and their organizational missions. By providing Florida citizens with the opportunity to register to vote, Civic Engagement Plaintiffs build trusted relationships with the applicants as they work to expand their volunteer network and a community of engaged and active voters.

9.    By mandating that Civic Engagement Plaintiffs issue this misleading warning and instructions for other voter registration avenues, SB 90 inserts Florida's government into the middle of that private, trusted relationship—in which the organization is a fiduciary—between a potential voter and registration agents.  This interference frustrates Civic Engagement Plaintiffs' ability to foster that trust and

hampers their voter registration efforts, communications with potential voters, and ability to associate with potential voters.

10.     Unless the challenged disclaimer and disclosure of provisions of SB 90 are enjoined, Civic Engagement Plaintiffs' constitutionally protected First Amendment speech and activity will continue to be co-opted by the government. Civic Engagement Plaintiffs, as well as many other individuals and groups, will be forced to mislead voter registration applicants as to their own efforts, denigrating their own associational activity integral to advancing their missions and beliefs. By making Civic Engagement Plaintiffs less effective at communicating their message, the public will have fewer options to register to vote, and fewer opportunities to associate with Plaintiffs in meaningful civic activities.

11.     By co-opting Civic Engagement Plaintiffs' First Amendment activities to convey the state of Florida's own onerous, misleading, and irrational message, the challenged provision of SB 90 does not serve any government interest and cannot survive the exacting scrutiny applied to such restrictions.

12.     SB 90 also fails to put Civic Engagement Plaintiffs on adequate notice as to possible penalties they might face for any non-compliance with the law and, thus, creates a chilling effect on their voter registration and associated civic engagement activities in violation of the Fourteenth Amendment.

13.     Civic Engagement Plaintiffs seek a declaratory judgment that the challenged provisions of Fla. Stat. § 97.0575 are unconstitutional, and an injunction prohibiting Defendants from enforcing them, thereby permitting Civic Engagement Plaintiffs' constitutionally protected, community-based voter registration speech and activities to continue without such unlawful interference.

14.     For many voters, reliance on an organization or individual the voter deems trustworthy does not end once they are registered to vote. Federal law specifically protects such personal choices as it concerns voters who, like Plaintiffs Kirk and Resnick and PVA Plaintiffs' members, require assistance in voting due to a disability or inability to read or write. Changes made by SB 90 directly conflict with this right.

15.     The Voting Rights Act ("VRA"), initially enacted in 1965, remains best known for its role in dismantling racially discriminatory election laws and protecting ballot access for voters of color. However, since 1982, it has also provided certain protections for voters with disabilities.

16.     With few exceptions, Section 208 of the VRA entitles voters who require assistance in voting due to "blindness, disability, or inability to read or write" ("208-covered voters") to receive aid in voting from a person of their own choosing. 52 U.S.C. § 10508. That right applies to all aspects of the voting process, from registration to the casting of a ballot, and regardless of the method by which the voter

lawfully chooses to vote. Congress added this crucial provision to promote covered voters' confidence that their ballots faithfully reflect their choices and to prevent disability-based discrimination. Through the provision, Congress expressed that people with disabilities can autonomously decide whom to trust for assistance in exercising this most fundamental of rights.

17.     Nonetheless, SB 90 restricts who may assist voters in requesting, receiving, and submitting mail ballots. Under these changes, a voter may only receive assistance from a limited list of qualifying family members or another individual who has handled a mail ballot for no more than one other unrelated voter. It will especially impact voters like Plaintiff Resnick, who does not have any immediate family members residing in Florida.

18.     SB 90's restrictions contradict the plain language of Section 208 of the VRA and must accordingly give way. PVA and Individual Plaintiffs seek declaratory and injunctive relief, barring the state from enforcing the mail ballot assistance restriction as to voters covered by Section 208.

## JURISDICTION AND VENUE

19.     This action is brought under the United States Constitution and federal law. The Court, therefore, has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1331, 1343, 1357, and 42 U.S.C. §§ 1983 and 1988. It also has jurisdiction under

the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, to grant the declaratory relief requested.

20.     This Court has personal jurisdiction over each Defendant because each is a citizen of Florida, Defendants Moody and Lee's principal places of business are in Tallahassee, Florida, Defendant Supervisors of Elections are constitutional officers of the state of Florida, and the passage of SB 90 (the act that gave rise to Plaintiffs' claims) occurred in Tallahassee, Florida.

21.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because the State Defendants conduct business in this District and all Defendants reside in Florida, and because a substantial portion of the events giving rise to these claims occurred in the Northern District of Florida.

## **PARTIES**

### **Harriet Tubman Freedom Fighters, Corp.**

22.     Plaintiff Harriet Tubman Freedom Fighters, Corp. ("HTFF") is a Florida 501(c)(3) non-profit corporation with a principal place of business, office, and registered agent in Jacksonville, Florida.

23.     HTFF was incorporated in October 2020 by a formerly incarcerated Black woman and voting rights activist, Rosemary McCoy ("McCoy").

24.     McCoy and HTFF's Secretary, Sheila Singleton, have been passionate and tireless advocates in the Florida voting rights space for several years: they

participated in collecting enough signatures to put the Voting Rights Restoration Amendment ("Amendment 4"), restoring voting rights to citizens disenfranchised in Florida due to prior felony convictions, on the ballot in 2018; they helped voters to register and Get-Out-the-Vote to ensure that Amendment 4 passed in 2018; and, when Florida's legislature enacted SB 7066 (which prevents returning citizens from registering to vote if they are unable to pay all fines, court costs, and restitution associated with their sentences), they became plaintiffs in a lawsuit challenging it.

25.     Recognizing that their voting rights work is bigger than themselves and identifying a need for an organization to specifically reach out to potential voters (particularly lower-income, people of color) affected by Florida's criminal justice system who are wary of the electoral process and being further marginalized and criminalized for participating in it, McCoy and Singleton joined with others to found HTFF as a charitable and educational non-profit.

26.     Today, HTFF connects networks of previously disparate volunteers from non-profits across Florida and, along with other Florida voting rights organizations, engages in weekly phone banking, canvassing, and panel discussions to engage citizens and inform them about voting rights issues ranging from federal legislation to municipal school board resolutions.

27.     Now that their officers and coalition partners are fully vaccinated from Covid-19, communities and organizations across Florida regularly solicit HTFF, as

a credible organization, to reach marginalized and returning citizen communities that are skeptical of the legitimacy of voter registration efforts and state actors, to help them conduct joint in-person canvassing, speaking engagements, and voter registration efforts[1] across Florida.

28.     HTFF has received grants specifically intended for voter registration, outreach, and mobilization efforts among new voters who are disproportionately voters of color, young people, Floridians with past felony convictions, lower-income individuals, and other marginalized groups.

29.     The communities HTFF serves are statistically less likely to register to vote, less likely to have the necessary identification and resources to enable them to register using Florida's online system, and more likely to rely on trusted non-state actors in their community with whom they identify for assistance and information in navigating the voter registration process.

30.     To inaugurate their 2021 voting rights efforts and commemorate Juneteenth, HTFF participated in a June 19, 2021 event where they had an HTFF-branded table and worked with a registered 3PVRO to provide people with voter

---

[1] HTFF applied to register as a 3PVRO to the Florida Division of Elections listing several individuals who will conduct voter registration activities on HTFF's behalf and was approved as a 3PVRO in July 2021.  While awaiting approval as a 3PVRO, HTFF's members continued, as they did in the past, to work (as employees or volunteers) with other organizations that are Florida-registered 3PVROs on their voter registration efforts.

registration information and information about upcoming elections and ballot initiatives.

31.    SB 90's requirements regarding the additional, unnecessary, and vague information HTFF must provide potential voters unlawfully compels them to engage in false speech, undermines the credibility they have established in the communities in which they work, and fails to provide them with proper notice as to the penalties for any alleged violations of the law.

32.    Delivering SB 90's disclaimer and disclosures also will require that HTFF divert time and resources to train its staff and volunteers to comply with SB 90, lengthen HTFF's interactions with each prospective registered voter (thereby making it harder to reach the same number of prospective voters in the same amount of time), and will necessitate HTFF diverting time and resources away from its other activities for SB 90-specific trainings and voter registration requirements.

**HeadCount**

33.    Head Count, Inc. ("HeadCount") is a national 501(c)(3) non-profit, non-partisan organization with a small full-time staff based in New York City. HeadCount's mission is to work with musicians and other popular influencers to promote participation in democracy, including through their voter registration efforts. To that end, HeadCount conducts voter registration activities at concerts and music festivals nationwide and runs programs that connect the popularity and power

of music with action. By reaching young people and music fans where they already are—at concerts and online—HeadCount makes civic participation accessible and compelling. HeadCount's organizational message is that people must speak to be heard.

34.    HeadCount has assisted over one million voter registration applicants nationwide since its founding, with nearly three hundred thousand applicants registering through their field programs. The organization has built a network of approximately forty-five thousand volunteers nationwide and has conducted more than six thousand in-person field events nationally since 2004, including hundreds in Florida since 2012 alone.[2] During these field events, HeadCount collects voter registration applications and then delivers them to election officials. HeadCount has helped over seven thousand Florida voters register by collecting and delivering their applications through their work in the field since 2012.

35.    HeadCount promotes partnerships between musicians, concert promoters, and volunteers. When artists affiliated with HeadCount play a concert in a major city, HeadCount helps voters register and rallies music fans to participate in democracy and increase their participation and voice in government. These live music events with voter registration facilitated by HeadCount take place all over the country and, during busy times in the election cycle, almost every night of the week.

---

[2] Plaintiff HeadCount has been a registered 3PVRO in Florida since June 2012.

HeadCount also works directly with many festivals, concert venues, and partners to help extend their reach. At every event, HeadCount offers voter registration for residents of 45 states using the federal mail-in voter registration form.

36.     HeadCount receives grant money, direct donations, and sponsorships to fund voter registration activities, including registration activities at concerts, festivals, and other events in Florida.

37.     The bulk of HeadCount's work nationally is done by thousands of volunteers. Some volunteers help voters register at concerts by engaging potential voters, assisting them with filling out forms, and collecting their applications for submission to election officials. Other volunteers take on leadership roles in the organization. As part of HeadCount's core mission, the organization builds civic volunteerism focused on young people and others who have not previously engaged in civic engagement work.

38.     HeadCount's voter registration activities in Florida are spearheaded by volunteer team leaders who are dedicated, experienced volunteers for the organization. HeadCount staffs each event with at least one volunteer team leader so that it can maintain the security of voter registration applications in the field to ensure that they are properly collected and delivered to election officials and requires all team leaders to review the organization's Team Leader manual. After review,

they receive a video-call field training and a separate training call regarding HeadCount's event management systems.

39.   HeadCount generally requires all volunteers to participate in a one-hour training session before each show, and rare exceptions are only made when a volunteer has previously taken the training. A significant number of volunteers are first-time volunteers, who are trained when they arrive for the event. Training covers how to engage people to register to vote, ensuring that applicants complete the forms, and emphasizing the importance of turning in all forms to the organization unaltered. Training also includes information about upcoming elections so that volunteers can spread an effective message about participating in elections.

40.   HeadCount's 2021 voter registration work is already underway, including planning for artist partnerships, producing materials, and implementing processes for quality control and application submission.

41.   HeadCount team leaders independently source community events such as street festivals, voter registration drives at schools or colleges, and other community gatherings. While events are generally put into the HeadCount database for volunteer recruitment, volunteers for such events are sometimes independently sourced by volunteer team leaders, with HeadCount providing materials, information, and email templates for events.

42.     HeadCount particularly intends to reach first-time voter registration applicants and transient voters under the age of 35. HeadCount is working on increasing civic engagement outreach on campuses, offering voter registration at shows within campus communities to increase outreach to young people.

43.     If HeadCount is unable to build trusted relationships with Florida voters during its voter registration activities in the state, it would be a significant loss to the organization's core mission, message, and partner relationships.

44.     The disclaimer and disclosure requirements in SB 90 will diminish HeadCount's message because, despite the fact that HeadCount prioritizes processing applications in accordance with each state's turnaround time using state-approved registration forms or federal voter registration forms, the organization will be required to mislead potential voters by indicating that it may not deliver their applications on time. HeadCount believes this disclaimer will groundlessly reduce the faith its registrants have in its voter registration program and in the organization itself.

45.     The disclaimers and disclosures required by SB 90 will make it more difficult for HeadCount to develop relationships with registrants and will make it less likely for event-goers to regularly turn to the organization as a trusted resource when they need assistance with voter registration forms for changes or updates.

46.    SB 90 has already affected HeadCount's registration activities; for example, HeadCount was forced to hold an emergency training for their May 22, 2021 event, an approach which is not sustainable given that hundreds of events can occur simultaneously. HeadCount also is concerned with the difficulty of training its volunteers and volunteer team leaders and communicating liability where the consequences of noncompliance are unclear.

47.    In addition, HeadCount is being forced to alter its established field volunteer training to cover the Florida-specific provisions. Because of the limited time to train field volunteers, communicating additional material such as the disclaimer requirement leads to reduced impact and effectiveness.

### Paralyzed Veterans of America's Florida-Based Chapters

48.    Paralyzed Veterans of America Florida Chapter ("PVAF") is a nonprofit 501(c)(3) organization whose mission is to improve the lives of veterans with a spinal cord injury or dysfunction and other persons with disabilities to achieve maximum health, productivity, and self-esteem in their daily lives. It was founded in Miami in 1956 and encompasses Monroe, Miami-Dade, Broward, Palm Beach, and Martin Counties. Its program services include ensuring quality health care, providing a wide range of wheelchair sports and recreation activities, educating the public on all issues encompassed in the Americans with Disabilities Act (ADA), and promoting research and education on spinal cord injury or dysfunction. As part of

the chapter's activities, PVAF advocates for policy changes to improve the lives of their members, and its officers include an Advocacy Director.

49.     Paralyzed Veterans of America Central Florida Chapter ("PVACF") was founded in 1977 and has approximately 350 members. It has developed a unique expertise on a wide variety of issues involving the special needs of quadriplegics, paraplegics, and individuals managing amyotrophic lateral sclerosis (ALS) and Multiple Sclerosis. It advocates for quality healthcare for its members, research and education addressing spinal cord injury and dysfunction, service-related benefits for veterans, civil rights, and opportunities which maximize its members' independence. It offers programs that assist members in applying for and obtaining veteran's benefits in a timely manner by providing a liaison with U.S. Department of Veterans' Affairs Medical Centers or other institutions where paralyzed veterans receive healthcare, by publishing a monthly magazine that keeps paralyzed veterans informed of what is happening nationally and locally in the legislature that directly affects them and their families, and by providing paralyzed veterans and other individuals with disabilities opportunities in adaptive sports and recreation in an effort to enhance a lifetime of health and fitness and offer better quality of life.

50.     The new mail ballot assistance restriction will affect the PVA Plaintiffs' members. For example, some of PVAF's members reside as in-patients at the local Veterans' Affairs facility for a period of months to over a year, and rely on the

assistance of a social worker at the facility in requesting, receiving, completing, and/or delivering their mail ballots. On information and belief, the Veterans' Affairs facility that services clients with spinal cord injuries in Monroe, Miami-Dade, Broward, Palm Beach, and Martin Counties employs four social workers—meaning that these social workers would only be able to assist a total of eight clients under the new law. On information and belief, four social workers serve the VA facilities across the following counties: Saint Lucie, Okeechobee, Indian River Brevard, Osceola, Orange, Seminole, Volusia, Lake, Marion, Flagler, Putnam, Saint Johns, Clay, Duval, Nassau, Union, Alachua, Columbia, Hamilton, Bradford, Baker, Suwannee, Lafayette, Madison, Taylor, Jefferson, Levy, Dixie, Wakulla, Leon, Franklin, Gulf, Liberty, Gadsden, Calhoun, Bay, Jackson, Holms, Washington, Walton, Okaloosa, Santa Rosa, and Escambia.

51.     Ensuring that their members can vote and have their voices heard is directly related to the mission of the PVA Plaintiffs to advocate for their members, including with respect to full participation in society, and with respect to policy and legislation benefiting people with disabilities including their members.

52.     The members of each of the PVA Plaintiffs include disabled Floridians eligible to vote who need assistance to vote because of their disability and who do not have or want assistance from immediate family in casting a vote by mail ballot.

Further, some of these members prefer to select a person to assist them, such as a social worker or caregiver, who is likely to be needed by more than one other voter.

### Steve Kirk

53.     Steve Kirk is a registered voter in Deltona, Florida and President of PVACF, as well as the treasurer for his local veterans' history museum. He served in the U.S. Army from 1967 to 1970. Due to an accident, he is quadriplegic and cannot use his hands. Mr. Kirk has always voted in person with the assistance of a hired caregiver, but he would like to vote by mail in future elections for greater convenience as he stopped driving long distances two years ago and largely relies on others for transportation. When voting at his polling place, he has needed assistance at all stages of the voting process, including marking his ballot. He prefers that his caregiver help him request, mark, and submit a mail ballot in future elections.

### Phyllis Resnick

54.     Plaintiff Phyllis Resnick is a registered voter in Aventura, Florida. She resides in a continuing care retirement community (CCRC) and is typically housed in its independent living center and uses a walker. However, she recently broke her femur bone and has been moved to the CCRC's care center. In order to receive her mail, someone must deliver it to her from the independent living center to her location in the care center, and she relies on others to take outgoing mail on her behalf from her location in the care center to the mailbox.  Currently, Mrs. Resnick

does not know when she will be released from the care center. She does not have any family members who reside in Florida. As a result, in order for Mrs. Resnick to vote in her current location, someone will have to take possession of her ballot. Mrs. Resnick prefers to vote by mail, has voted by mail since 2012—when she first broke her femur bone—and plans to vote by mail in all future elections.

**Defendants**

55.    Laurel Lee is the Secretary of State ("Secretary") of the State of Florida and is sued in her official capacity. The Secretary of State is the chief election officer of the state, Fla. Stat. § 97.012(1), and is responsible for implementing, operating, and maintaining a uniform statewide voter registration system. *Id.* § 97.012 (11); *id.* § 98.035(1). Among other things, the Secretary is authorized to "adopt by rule uniform standards for the proper and equitable interpretation and implementation of the requirements of chapters 97 through 102 and 105 of the Florida Election Code," as well as "provide uniform standards for the proper and equitable implementation of the registration laws by administrative rule of the Department of State." *Id.* § 97.012(1)-(2).

56.    The Secretary is also authorized under Florida law to "[b]ring and maintain such actions at law or in equity by mandamus or injunction to enforce the performance of any duties of a county supervisor of elections or any official performing duties with respect to chapters 97 through 102 and 105 or to enforce

compliance with a rule of the Department of State adopted to interpret or implement any of those chapters." *Id.* § 97.012 (14). Complaints of violations may be filed with the Department of State. *Id.* § 97.023(1)(a).

57.     Defendant Ashley Moody is the Attorney General of the State of Florida.[3] Florida's "attorney general shall be the chief state legal officer. There is created in the office of the attorney general the position of statewide prosecutor. The statewide prosecutor shall have concurrent jurisdiction with the state attorneys to prosecute violations of criminal laws. . ."  Fla. Const. Art. IV, Sec. 4(b).  If the Secretary of State "reasonably believes that a person has committed a violation of [Section 97.0575], the Secretary may refer the matter to the Attorney General for enforcement. The Attorney General may institute a civil action for a violation of [Section 97.0575] or to prevent a violation of this section." Such an action for relief may include a "permanent or temporary injunction, a restraining order, or any other appropriate order." Fla. Stat. § 97.0575(4).

58.     Defendants Supervisors of Elections, sued in their official capacities only, are elected or appointed Florida constitutional officers and are officials in each of the Florida counties where members of PVA and Individual Plaintiffs seek to

---

[3] According to the Attorney General's official website "The Attorney General is the statewide elected official directed by the Florida Constitution to serve as the chief legal officer for the State of Florida. . . Additionally, the Attorney General . . . defends the state in civil litigation cases and represents the people of Florida when criminals appeal their convictions in state and federal courts."  https://myfloridalegal.com/pages.nsf/Main/F06F66DA272F37C885256CCB0051916F

exercise their voting rights under Section 208.  Defendants Supervisors of Elections are responsible for administering elections in their respective counties, which responsibilities include, but are not limited to, administering voting by mail and accepting vote-by-mail ballots. The Supervisor Defendants are: Christina White, in her official capacity as Miami-Dade County Supervisor of Elections; Lisa Lewis, in her official capacity as Volusia County Supervisor of Elections; Kaiti Lenhart, in her official capacity as Flagler County Supervisor of Elections; Mike Hogan, in his official capacity as Duval County Supervisor of Elections; Joseph R. Morgan, in his official capacity as Wakulla County Supervisor of Elections; Mary Jane Arrington, in her official capacity as Osceola County Supervisor of Elections; Bill Cowles, in his official capacity as Orange County Supervisor of Elections; Lori Scott, in her official capacity as Brevard County Supervisor of Elections; Tommy Doyle, in his official capacity as Lee County Supervisor of Elections; Maureen Baird, in her official capacity as Citrus County Supervisor of Elections; Janet H. Adkins, in her official capacity as Nassau County Supervisor of Elections; Tomi S. Brown, in her official capacity as Columbia County Supervisor of Elections; Chris Milton, in his official capacity as Baker County Supervisor of Elections; Laura Hutto, in her official capacity as Hamilton County Supervisor of Elections; Heath Driggers, in his official capacity as Madison County Supervisor of Elections; Jennifer H. Kinsey, in her official capacity as Suwanee County Supervisor of Elections; Chris H,

Chambless, in his official capacity as Clay County Supervisor of Elections; Vicky Oakes, in her official capacity as St. Johns County Supervisor of Elections; Amanda Seyfang, in her official capacity as Bradford County Supervisor of Elections; Alex Hays, in his official capacity as Lake County Supervisor of Elections; Paul A. Lux, in his official capacity as Okaloosa County Supervisor of Elections; William Keen, in his official capacity as Sumter County Supervisor of Elections; Wesley Wilcox, in his official capacity as Marion County Supervisor of Elections; Joe Scott, in his official capacity as Broward County Supervisor of Elections; Mark Earley, in his official capacity as Leon County Supervisor of Elections; Mark Andersen, in his official capacity as Bay County Supervisor of Elections; Kim Barton, in her official capacity as Alachua County Supervisor of Elections; Vicki Davis, in her official capacity as Martin County Supervisor of Elections; Sharon Chason, in her official capacity as Calhoun County Supervisor of Elections; David H. Stafford, in his official capacity as Escambia County Supervisor of Elections; Tappie A. Villane, in her official capacity as Santa Rosa County Supervisor of Elections; Gertrude Walker, in her official capacity as St. Lucie County Supervisor of Elections; Connie Sanchez, in her official capacity as Gilchrist County Supervisor of Elections; Christopher Anderson, in his official capacity as Seminole County Supervisor of Elections; Leslie R. Swan, in her official capacity as Indian River County Supervisor of Elections; Wendy Link, in her official capacity as Palm Beach County Supervisor

of Elections; Craig Latimer, in his official capacity as Hillsborough County Supervisor of Elections; Penny Ogg, in her official capacity as Highlands County Supervisor of Elections; Paul A. Stamoulis, in his official capacity as Charlotte County Supervisor of Elections; Ron Turner, in his official capacity as Sarasota County Supervisor of Elections; Shirley Anderson, in his official capacity as Hernando County Supervisor of Elections; and Joyce Griffin, in her official capacity as Monroe County Supervisor of Elections.

## **FACTS**

### I.      **Voter Registration in Florida**

59.     Floridians need more, not fewer, voter registration opportunities. According to the U.S. Census Bureau's *Current Population Survey* ("CPS"), approximately 10,495,000 Florida citizens were registered to vote as of November 2020, out of a citizen voting age population of 15,645,000.[4] Therefore, as of November 2020, approximately 33 percent of eligible citizens in Florida, or one in three, were not registered to vote. The unregistered citizen population is not distributed equally among racial groups. While approximately only 29 percent of voting-age white citizens are unregistered, 35 percent of Black voting-age citizens,

---

[4] U.S. Census Bureau, Community Population Survey,
Voting and Registration in the Election of November 2020, Table 14a. Reported Voting and Registration for States: November 2020 (April 2021) *available at* https://www2.census.gov/programs-surveys/cps/tables/p20/585/table04a.xlsx

nearly 44 percent of Asian American voting-age citizens, and 41 percent of Hispanic voting-age citizens are unregistered.[5]

60.     Voter registration drives play an important role in facilitating voter registration of eligible citizens. Community-based voter registration drives are a particularly important tool for members of marginalized communities to register to vote. According to the CPS, voters of color are more likely to identify as having registered at a registration drive or at a school, hospital, or campus compared with white voters. For example, in the 2018 election cycle, while 3.1 percent of white voters reported registering through a drive, the percentage was 5.3 for voters identifying as Black and 5.5 percent for those identifying as Hispanic.[6] Similarly, in 2018, 4.1 percent of white registrants reported registering at a school, hospital, or campus, compared with 7.5 percent of those identifying as Black and 7.1 percent of those identifying as Hispanic.[7] In the 2020 cycle, even with much of the election cycle coinciding with the Covid-19 pandemic, 2.4 percent of white voters reported registering through a drive, while 3.6 percent of voters identifying as Black and 3.8

---

[5] U.S. Census Bureau, Community Population Survey,
Voting and Registration in the Election of November 2020, Table 4b. Reported Voting and Registration, by Sex, Race and Hispanic Origin, for States: November 2020 (April 2021) *available at* https://www2.census.gov/programs-surveys/cps/tables/p20/585/table04b.xlsx
[6] U.S. Census Bureau, Community Population Survey,
Voting and Registration in the Election of November 2018. Table 12. Method of Registration by Selected Characteristics: November 2018 *available at* https://www2.census.gov/programs-surveys/cps/tables/p20/583/table12.xlsx.
[7] *Id.*

percent for those identifying as Hispanic reported doing the same. [8] Similarly, in 2020, 2.5 percent of white registrants reported registering at a school, hospital, or campus, compared to 4.2 percent of those identifying as Black and 4.4 percent of those identifying as Hispanic.[9]

61.     Plaintiffs HTFF and HeadCount, like many community voter registration organizations, conduct or intend to conduct voter registration drives in Florida,[10] during which they interact with potential voters face-to-face to encourage them to participate in the political process and to register to vote. These conversations take place at schools and universities, community events, parks, churches, workplaces, malls, conferences, and public gatherings, as well as in parking lots, transportation hubs, and on city streets. These initial interactions culminate when the organization collects voter registration applications from potential voters and submits them on their behalf. Critically, they seek to develop relationships with new voters to further promote civic engagement, including through get-out-the-vote activities and other community involvement.

---

[8] U.S. Census Bureau, Community Population Survey,
Voting and Registration in the Election of November 2020, Table 12 (Method of Registration by Selected Characteristics) (April 2021) *available at* https://www2.census.gov/programs-surveys/cps/tables/p20/585/table12.xlsx.
[9] *Id.*
[10] Plaintiff HeadCount has been a registered 3PVRO since June 2012. Plaintiff Harriet Tubman Freedom Fighters submitted its materials to register as a 3PVRO to the Division was approved as a 3PVRO in July 2021; its staff and volunteers have volunteered on behalf of other 3PVRO-registered organizations.

62.     Civic Engagement Plaintiffs' voter registration staff and volunteers educate non-voters not only about how political participation can lead to social change and make democratic institutions more responsive to community needs, but also how the act of registering to vote helps underrepresented persons and communities establish their political worth, standing, and right to speak at the polls. Registering and voting builds the political respect and power of a citizen's community by making elected officials and candidates for elected office attentive to the citizen's community. Fostering political and civic engagement in this manner is a central part of Civic Engagement Plaintiffs' voter registration activity.

63.     Numerous Floridians who register to vote each year do so through interactions with their fellow citizens through such voter registration outreach activities. Civic Engagement Plaintiffs' voter registration activities are critical to such Plaintiffs' core political speech and associational rights.

64.     The right to vote is far from universally exercised. Through their voter registration work, Civic Engagement Plaintiffs express the importance of civic engagement and political participation, particularly among politically underrepresented groups. By ensuring people's voter registration forms are properly submitted, these Plaintiffs ensure the fullest expression of their communities and voters' views on issues such as government responsiveness, racial justice, and policies that promote religious tolerance and acceptance. Their assistance to others

in registering to vote is a political statement in and of itself: that they value the democratic process and the rights of all eligible citizens to access the franchise. Civic Engagement Plaintiffs' voter registration activities are among the most effective and credible means of expressing these views.

65.   By engaging in voter registration activities, Civic Engagement Plaintiffs also develop, and intend to develop in the future, associations with individuals who share their values and goals.

66.   SB 90's requirement compelling Civic Engagement Plaintiffs to misleadingly denigrate their own voter registration efforts will chill these Plaintiffs' speech, expression, and associational activities. This will harm the organizational mission of each Civic Engagement Plaintiff by minimizing each's ability to rally its community and use the franchise to weigh in on issues of importance, including the importance of participation itself.

## II.   Florida Historically Targets Community Voter Registration Activity with Unconstitutional First Amendment Limitations

67.   During the 2005 legislative session, the Florida legislature enacted the Third-Party Voter Registration Law ("the Law") to regulate organizations that conduct community voter registration activity. Fla. Stat. § 97.0575 (2005). It imposed fines upon 3PVROs if the completed voter registration applications they collected—through no fault of their own—were not delivered to the applicable

supervisor of elections within 10 days, before the registration books closed, or at all. *Id.* The Law exempted political parties from these regulations without any demonstration that the penalties or the carveout of the parties advanced the state's interests. *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d. 1314, 1339 (S.D. Fla. 2006).

68. This Court found these provisions unconstitutionally violated the plaintiffs' First Amendment rights and enjoined Florida from enforcing them. *Id.* at 1342. The court found that:

> the Law's demonstrated impact is to limit the means of voter registration in Florida, contradict the longstanding tradition of not discriminating against non-political parties with respect to voter registration, and burden the Plaintiffs' protected speech and associational rights. While the Court is extremely reluctant to set aside an enactment of the Legislature, given the magnitude of Plaintiffs' First Amendment freedoms at stake in this case, the Third–Party Voter Registration Law's civil penalties scheme and exclusion of political parties is unconstitutional.

*Id.* at 1339.

69. Undeterred, Florida's policing of community voter registration escalated in 2011 with the passage of a new set of amendments to the Law that required 3PVROs to deliver voter registration applications to the applicable supervisor of elections within 48 hours of completion or the next business day and fined them anywhere from $50 to $500 per voter registration application for failing

to do so, with a cap of $1000 assessed to an organization in a calendar year. *See*, Fla. Stat. § 97.0575(3)(a) (2011).

70.    The 2011 amendments to the Law also required 3PVROs to identify each of its officers and/or agents (including volunteers who solicit, but do not collect, voter registration forms) to the Division of Elections ("the Division") and, if any such person departs the organization, to report such change within 10 days.  Fla. Stat. § 97.0575(1) (2011); Fla. Admin. Code r. 1S-2.042(2)(e)-(3)(e) (2011), *available at* https://www.flrules.org/Gateway/View_notice.asp?id=10555848.

71.    In addition, the 2011 amendments required 3PVROs' agents to each file a sworn statement that they will obey election laws on a form that stated the penalties for false registration but did not make clear that such penalties only applied to a willful submission of false voter registration information. *See* Fl. Stat. §§ 97.0575(1)(d) 104.011 (2011); Fla. Admin. Code r. 1S-2.042(1)(b) (2011).

72.    Lastly, the 2011 amendments required 3PVROs to report to the Division, by the 10th of each month, the number of voter registration forms they provided to their agents and received back.  Fl. Stat. § 97.0575(5) (2011); Fla. Admin. Code r. 1S-2.042(5)(a) (2011).

73.    Once again, this Court found these provisions likely violated the plaintiff organizations' First Amendment rights and the National Voter Registration Act of 1993, and preliminarily enjoined Florida from enforcing them fully as written.

*League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1168 (N.D. Fla. May 31, 2012). The court later entered a permanent injunction under similar terms with only minor changes pursuant to the parties' agreement. *League of Women Voters of Fla. v. Detzner*, No. 4:11CV628-RH/WCS, 2012 WL 12810507, at *1 (N.D. Fla. Aug. 30, 2012).[11]

### III.   Prior to SB 90, Florida Significantly Regulated 3PVROs

74.   Following the 2012 court order in *Browning*, community voter registration activity remained heavily and comprehensively regulated in Florida through its 3PVRO regulatory scheme.

75.   3PVROs must register directly with the Division and provide detailed information about their operations, officers, employees, and agents.[12]

76.   The Division publishes this information online in its free, publicly accessible 3PVRO database.

77.   Defendant Lee promulgates the Florida state voter registration form. Fla. r. 1S-2.040. The form lists various methods for registering to vote, including that the form is available online at https://registertovoteflorida.gov.  It also contains information regarding the voter registration deadline.

---

[11] Some of SB 90's changes to § 97.0575 deleted provisions already enjoined by the 2012 ruling. *See* Fla. Ch. Laws ch. 2021-11 § 7 (deleting provisions of § 97.0575(1) and (5)).
[12] *See* Florida Third-Party Voter Registration Organization Registration Form, Fla. Div. of State, Form DSDE-119, *available at* https://files.floridados.gov/media/693298/dsde119.pdf.

78.     Notably, not all Florida voting-eligible citizens are able to register fully online because, to submit a Florida voter registration application online, an applicant must have a Florida driver's license or identification card issued by the Department of Highway Safety and Motor Vehicles ("DHSMV"). Fla. Stat. § 97.0525(4)(c)(2020). If an applicant has not been issued a Florida driver's license or Florida identification card, the online voter registration system populates the applicant's information into a printable voter registration application that the applicant must print, sign, date, and deliver to the supervisor of elections. *Id.*

79.     In addition, Florida law explicitly deems 3PVROs fiduciaries of the voter registration applicant and requires them to submit any and all completed voter registration applications by the book closing or within a certain number of days after the applicant's completion.  Fla. Stat. § 97.0575(3) (2020); Fla. Admin Code. Ann. r. 1-S2.042(5)(a) (2012).[13]

80.     If a 3PVRO fails to return a voter registration applicant's forms within the specified period it may be subject to fines and referred to the Florida Attorney General for legal action. Fla. Stat. § 97.0575(3)-(4) (2020). The Attorney General may then "institute a civil action for a violation of this section or to prevent a violation of this section. An action for relief may include a permanent or temporary

---

[13] As revised by SB 90, Florida Stat. § 97.0575 now requires that applications collected by 3PVROs be delivered "within 14 days after being completed by the applicant, but not after registration closes for the next ensuing election."  Fla. Stat. Ann. § 97.0575(3)(a) (West 2021).

injunction, a restraining order, or any other appropriate order."
*Id.*

## IV.   SB 90's Changes to Florida's Existing 3PVROs Regulatory Framework

81.   The 2021 amendments to the Law encompassed within SB 90 Section 7, are cut from the same unconstitutional cloth as their predecessors; they are an unnecessary abrogation of 3PVROs' First Amendment rights.

82.   Specifically, they require that 3PVROs "notify the applicant at the time the application is collected that the organization might not deliver the application to the division or the supervisor of elections in the county in which the applicant resides in less than 14 days or before registration closes for the next ensuing election and must advise the applicant that he or she may deliver the application in person or by mail."  Fla. Stat. Ann. § 97.0575(3)(a) (2021) (emphases added).

83.   They also require that, at the time of soliciting voter registrations, 3PVROs "inform the applicant how to register online with the division and how to determine whether the application has been delivered."[14]  *Id.* (emphasis added).

84.   During the legislative process, lawmakers failed to advance any meaningful evidence of registrant confusion as to the nature of the organizations'

---

[14] Notably, Florida has no centralized system for the public to determine whether a voter registration application has arrived at the division of elections or a supervisor of elections' office, meaning applications may not be entered in the state's system on the day they are received. *See* Fla. Stat. § 97.053(7) (2020) (requiring applications to be entered into the statewide voter registration database by a registration official "within 13 days after receipt").

activities or of any systemic or purposeful instance of late-delivered or undelivered applications.

85.   SB 90, including the provisions in Section 7 of the Law challenged in this case, had an immediate effective date, giving voter registration organizations, including plaintiffs, little to no time to plan.

86.   Historical data that the Division gathered and published on voter registration shows that 59,805 new voters were registered via 3PVROs in 2020, compared to 2019, when 63,212 voters registered through 3PVROs, and 2018, when 96,516 voters registered through 3PVROs.[15]

87.   In the leadup to the 2021 legislative session, there were no reported widespread problems with 3PVRO voter registration activity. In particular, on information and belief, there is no evidence of widespread untimely submitted applications.

88.   Given these historical and statistical realities, there is no legitimate, let alone compelling, reason for why the Florida legislature moved quickly to mandate that community organizations conducting voter registration activities engage in prescribed speech disclaiming their effectiveness and competence, and provide potential voters information about the state's preferred method of "how to register"

---

[15] *See* Voter Registration – Method & Location, Fla. Div. of Elections, *available at* https://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-registration-reportsxlsx/voter-registration-method-and-location/ (last updated Apr. 30, 2021).

online, regardless of whether that option is actually available to the applicant, and pass along information regarding application status that is not uniformly available.

## V.     Florida's 2021 Legislative Session Created a Cloud of Repression for First Amendment Freedoms

89.     SB 90 and its heightened restrictions on community voter registration organizations' speech and activity did not occur in a vacuum as a single isolated piece of legislation; they occurred during a legislative session marred by stymied public input, legislative directives from Florida's chief executive, and similarly extreme bills restricting civic freedoms.

90.     Mere weeks before SB 90 passed and a day before the announcement of the verdict in the George Floyd murder trial, Florida passed HB 1, a bill expanding felonies and mandating minimum sentences for activities associated with public assembly and protest, and immediately sent it to the governor for his signature.[16]

91.     Governor DeSantis publicly advocated for HB 1 well before it came to his desk for signature; on September 21, 2020, a week before voter registration

---

[16] *See* Ch. 2021-6, Laws of Fla. (defining a felony riot crime under § 870.01(2) where an individual "participates in a violent public disturbance involving an assembly if three or more persons, acting with a common intent to assist each other in . . . disorderly conduct, resulting in . . . imminent danger of injury to another person or damage to property. *See also* Press Release, Ron DeSantis, Governor, Florida, Governor Ron DeSantis Announces the "Combatting Violence, Disorder and Looting and Law Enforcement Protection Act*,"* press release on Sept. 21, 2020, *available at* https://www.flgov.com/2020/09/21/governor-ron-desantis-announces-the-combatting-violence-disorder-and-looting-and-law-enforcement-protection-act/ (proposed new legislation making it a "3rd degree felony when 7 or more persons are involved in an assembly and cause damage to property or injury to other persons"); *Dream Defenders et al. v. DeSantis*, 4:21-cv-00191-MW-MAF (N.D. Fla. filed May 11, 2021).

closed for the 2020 general election, he issued a proposed legislation blueprint for what would eventually become HB 1 and exhorted "every single person running for office. . . to let voters know where you stand on this bill[.]"[17]

92.    Both restrictive bills were rammed through the Florida legislature during a session marked by drastically curtailed public access and participation, with limited access to the state legislature, one minute time caps on public comment, and silencing public commenters expressing opposition.

93.    In another unusual move for a state government with expansive Sunshine Laws, Florida's governor barred all media from attending his signing of SB 90, but live-streamed what his communications director characterized as a "Fox exclusive" on Fox & Friends, in which he signed SB 90 and then presented tv-ready "graphics" summarizing the bill as "Banning Ballot Harvesting" and "Private Money from Running Elections (aka Zuckerbucks)."[18]

---

[17] *See* Kirby Wilson, "Ron DeSantis: Any Municipality that 'defunds' police will lose state funding," *Tampa Bay Times* (Sept. 21, 2020), *available at* https://www.tampabay.com/news/florida-politics/2020/09/21/ron-desantis-any-municipality-that-defunds-police-will-lose-state-funding/.

[18] *See* Renzo Downey, "Gov. DeSantis signs elections bill in Fox News exclusive," *Fla. Pol.* (May 6, 2021), *available at* https://floridapolitics.com/archives/427313-gov-desantis-signs-elections-bill-in-fox-news-exclusive/; Gary Fineout, DeSantis gives Fox "exclusive" of him signing election bill, Politico (May 6, 2021), *available at* https://www.politico.com/states/florida/story/2021/05/06/desantis-gives-fox-exclusive-of-him-signing-election-bill-1380665?nname=florida-playbook&nid=0000014f-1646-d88f-a1cf-5f46b4500000&nrid=31980f02-54f3-47e5-ad73-6e3f1cc93947&nlid=630310; NBC 6 and The Associated Press, "Gov. DeSantis Signs GOP-Backed Elections Bill at Event Closed to Local Media," *6 South Florida*, May 6, 2021, *available at* https://www.nbcmiami.com/news/local/gov-desantis-signs-gop-backed-elections-bill/2444871/; Steve Contorno, "Did DeSantis violate First

94.     Given the lack of transparency throughout the consideration and passage of SB 90, coupled with legislators and the governor's public statements advocating for these restrictions and others curtailing the right to associate, assemble, and engage in protest, speech, and other core political activities in Florida, it is clear SB 90 was not intended to promote civic engagement or protect voters, but instead to repress Civic Engagement Plaintiffs' constitutionally protected right to free speech, their right not to be compelled to engage in government speech, and their freedom to associate with other civic-minded Floridians.

95.     Because of SB 90, Civic Engagement Plaintiffs must divert scarce resources to comply with the new requirements imposed under Section 97.0575(3)(a). These requirements unnecessarily conscript Civic Engagement Plaintiffs' scarce organizational resources that would otherwise be spent helping voters register, following up with voters, and undertaking other activities to advance their missions. Resources that would otherwise be directed at reaching and engaging voters must now be spent on training time and materials for an unnecessary law.

**VI.    Federal law secures disabled voters' right to assistance from a person of their choice.**

---

Amendment with Fox News only bill signing?" *The Tampa Bay Times* (May 7, 2021) *available at* https://www.tampabay.com/news/florida-politics/2021/05/07/did-desantis-violate-first-amendment-with-fox-news-only-bill-signing/.

96.     SB 90 also made changes to the Florida election code that violate a federal statute. Section 208 of the VRA states: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. Under the Act, the terms "vote" and "voting" mean

> all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.

*Id.* § 10310(c)(1); *see OCA-Greater Houston v. Texas*, 867 F.3d 604, 615 (5th Cir. 2017).

97.     In adopting this provision, the Senate Judiciary Committee explained that,

> [t]o limit the risks of discrimination against voters in these specified groups and avoid denial or infringement of their right to vote, the Committee has concluded that they must be permitted to have the assistance of a person of their own choice. The Committee concluded that this is the only way to assure meaningful voting assistance and to avoid possible intimidation or manipulation of the voter. To do otherwise would deny these voters the same opportunity to vote enjoyed by all citizens.

S. Rep. 97-417, at 241 (1982). It explicitly wrote that it intended Section 208 to preempt state law when state law "[denies] the assistance at some stages of the voting process during which assistance was needed." *Id*.

98.     Any registered Florida voter may cast a ballot by mail. *See* Fla. Stat. § 101.62.

99.     Once a voter receives the mail ballot, Florida law provides that

[a]ll electors must personally mark or designate their choices on the vote-by-mail ballot, except: (1) Electors who require assistance to vote because of blindness, disability, or inability to read or write, who may have some person of the elector's choice, other than the elector's employer, an agent of the employer, or an officer or agent of the elector's union, *mark the elector's choices or assist the elector in marking his or her choices on the [vote-by-mail] ballot*."

Fla. Stat. § 101.661(1) (emphasis added). By its plain language, this state law provision is limited to the actual marking of the ballot, and does not apply to other aspects of the vote-by-mail process.

100.    Until the most recent legislative session, Florida law made it a misdemeanor for "[a]ny person" to "provide[ ] or offer[ ] to provide" or accept "a pecuniary or other benefit in exchange for distributing, ordering, requesting, collecting, delivering, or otherwise physically possessing more than two vote-by-mail ballots per election in addition to his or her own ballot or a ballot belonging to an immediate family member, . . .". Fla. Stat. § 104.0616(2), 2016 Fla. Sess. Law Serv. Ch. 2016-3, § 38 (eff. July 1, 2016). The term "immediate family member"

meant "a person's spouse or the parent, child, grandparent, or sibling of the person or the person's spouse." *Id.* § 104.0616(1).

101.   SB 90 further limits the assistance a covered voter may request in voting by mail. Under the amended Section 104.0616, "[a]ny person who distributes, orders, requests, collects, delivers, or otherwise physically possesses more than two vote-by-mail ballots per election in addition to his or her own ballot or a ballot belonging to an immediate family member, . . . commits a misdemeanor of the first degree . . .". *Id.* § 104.0616(2), 2021 Fla. Sess. Law Serv. Ch. 2021-11, § 32 (eff. May 6, 2021). It therefore extends the limitation to individuals regardless of pecuniary or other benefit and could encompass simple acts like taking the voter's ballot from a mailbox to the voter's residence, or bringing a ballot from a voter's hospital room to a mail collection area.

102.   Although SB 90 expanded the definition of "immediate family member" to include a voter's grandchild, it continues to exclude—among other close relatives—aunts, uncles, cousins, nephews, and nieces, or unrelated individuals such as a significant other or one who served as the voter's legal guardian when the voter was a minor. *Id.* § 104.0616(1). Now, a voter covered by Section 208 may only request assistance in returning a mail ballot from: (1) an "immediate family member" within the meaning of the statute, or (2) another person who has assisted no more than one other voter who is not an immediate family member. It is unclear how this

restriction interacts with Section 101.661. Unlike Section 101.661, which permits a voter requiring assistance to receive help in *marking* the voter's mail ballot from "some person of the elector's choice, other than the elector's employer, an agent of the employer, or an officer or agent of the elector's union," *id.* § 101.661(1), SB 90 does not provide an exception that allows 208-covered voters to make their own decision regarding who they want to assist them in other related and necessary aspects of voting their ballot, particularly those that include the assistor "physically possessing" the ballot. *See id.* § 104.0616(2) (as amended).

103.   Neither the statutes governing the instructions that must be included with a mail ballot, nor the recently revised Division of Elections' webpage on accessible voting warn voters about restrictions on who may return a ballot on a voter's behalf. *See id.* §§ 101.64 and 101.65; "Accessible Voting for Persons with Disabilities," *Voting*, FLA. DIV. OF ELECTIONS, https://dos.myflorida.com/elections/for-voters/voting/accessible-voting-for-persons-with-disabilities/ (last visited Jun. 24, 2021). These omissions risk subjecting people who assist Section 208-covered voters to criminal penalties in violation of federal law and without proper notice.

104.   Section 104.0616's mail ballot assistance restriction does not apply to "supervised voting at assisted living facilities and nursing home facilities as authorized under s. 101.655 . . .". *Id.* § 104.0616(2). An "assisted living facility" is

> any building or buildings, section or distinct part of a building, private home, boarding home, home for the aged, or other residential facility, regardless of whether operated for profit, which through its ownership or management provides housing, meals, and one or more personal services for a period exceeding 24 hours to one or more adults who are not relatives of the owner or administrator.

*Id.* § 429.02(5). A "nursing home facility" is "any facility which provides nursing services as defined in part I of chapter 464 and which is licensed" pursuant to Fla. Stat. § 400.062. *Id.* § 400.021(12). The supervisor and facility administrator select a single "date and time when the supervised voting will occur." *Id.* § 101.665(3). Voters who have the option to vote via supervised voting are not required to do so; all Florida voters retain the right to vote by mail. *Id.* § 101.655(5).

105.   According to the U.S. Census Bureau, over 13 percent of Floridians have a disability—slightly more than the national average.[19] That rate includes some 2.7 million adults, with 22.5 percent of adults aged 65 to 74 and 44.5 percent of adults aged 75 or older reporting having a disability.[20]

106.   In the 2020 General Election, ten percent of voters with disabilities who cast a mail ballot reported needing assistance in returning their ballots.[21] Eight percent turned to a friend or neighbor for assistance, and seven percent received

---

[19] Table S1810, "Disability Characteristics," U.S. CENSUS BUREAU, *available at* https://data.census.gov/cedsci/table?q=S1810&g=0100000US_0400000US12&tid=ACSST1Y2019.S1810&hidePreview=true (last visited June 18, 2021).

[20] *Id.*

[21] Lisa Schur et al., *Disability and Voting Accessibility in the 2020 Elections: Final Report on Survey Results*, RUTGERS UNIV. 9 (Feb. 16, 2021), https://www.courthousenews.com/wp-content/uploads/2021/02/voting-accessibility-in-2020-elections.pdf.

assistance from a home health aide.[22] A quarter of voters with vision impairments and 22 percent of voters who require assistance in their daily routines needed help voting by mail.[23]

107.   The rate of voters with disabilities who experienced difficulty voting by mail in the 2020 General Election was more than double that of voters without disabilities.[24]

108.   Although people with disabilities and those without disabilities have similar voter registration rates, the voter turnout rate among voters with disabilities was seven percent lower than that for voters without disabilities in 2020.[25] The disparities were greater between voters with vision and cognitive impairments and voters without disabilities, respectively.[26]

109.   Federal law entitles Individual Plaintiffs, the two PVA Plaintiffs' members, and similarly situated voters who require assistance "by reason of blindness, disability, or inability to read or write" to receive help in voting from a "person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. This rule applies to "*all* action necessary to make a vote effective in any primary, special, or

---

[22] *Id.*
[23] *Id.*
[24] *Id.* at 5.
[25] *Id.*, "Table 3: Voter Registration and Turnout in 2020."
[26] *Id.*

general election." *Id.* 10310(c)(1) (emphasis added). "[A] state cannot restrict this federally guaranteed right by enacting a statute tracking its language, then defining terms more restrictively than as federally defined." *OCA-Greater Houston*, 867 F.3d at 615.

110.   Nonetheless, under Florida law, Section 208-covered voters may only receive help in obtaining and/or returning their mail ballots from an immediate family member or another person who has assisted no more than one other voter who is not an immediate family member. *See* Fla. Stat. § 104.0616. Section 208 of the VRA therefore pre-empts Section 104.0616 as to Section 208-covered voters, and these state statutes cannot be enforced as to these voters.

**CLAIMS FOR RELIEF**

**COUNT I**

**Void for Vagueness**
**Plaintiffs Harriet Tubman Freedom Fighters and HeadCount**
**(Defendants' Lee and Moody's Violation of Plaintiffs' Fourteenth**
**Amendment Right**
**Pursuant to 42 U.S.C. § 1983)**

111.   Plaintiffs repeat and reallege each and every allegation contained in preceding paragraphs as if fully set forth herein.

112.   The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

113.   "The void-for-vagueness doctrine reflects the principle that a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Harris v. Mex. Specialty Foods, Inc.*, 564 F.3d 1301, 1310 (11th Cir. 2009) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984)) (internal quotation marks omitted) (alteration in original).

114.   "Vagueness within statutes is impermissible because such statutes fail to put potential violators on notice that certain conduct is prohibited, inform them of the potential penalties that accompany noncompliance, and provide explicit standards for those who apply the law." *Id.* at 1311. Lawmakers must observe "rigorous adherence" to the Due Process Clause's notice requirements when crafting statutes regulating free speech. *Wollschlaeger v. Gov. of Fla.*, 848 F.3d 1293, 1320 (11th Cir. 2017) (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)).

115.   The void for vagueness doctrine applies when violation of a statute triggers civil proceedings, as well as when criminal prosecution is threatened. *See id.* (invalidating as void for vagueness a statute subjecting noncompliant medical doctors to disciplinary action by the Florida Board of Medicine). Given Plaintiffs HTFF and HeadCount's finite resources, the imposition of substantial financial penalties, incurrence of costs associated with unknown legal proceedings, or

revocation of their 3PVRO status for inadvertent violations of Section 97.0575 would threaten these Plaintiffs' ability to carry out voter registration activities.

116.   Sections 97.0575(3)(a)(1) through (3) establish fine amounts for untimely returning completed forms, but are wholly silent on any specific penalties for violating the new disclaimer and disclosure requirement. *See id.* § 97.0575(3)(a)(1)–(3). As a result, it is unclear whether the aggregate annual fine of $1,000 that may be imposed "pursuant to this paragraph" also encompasses fines for failing to provide the disclaimer and disclosures. *See id.* Although the "aggregate" fine may only be assessed against 3PVROs, *see id.*, it is at best unclear whether that aggregate fine amount incorporates fines for violating the disclaimer and disclosure requirement; thus, it also remains unclear whether 3PVROs' volunteers may be held liable for not issuing the disclaimer or disclosures.

117.   Even if the $1,000 aggregate fine amount could be said to include fines for violating the disclaimer and disclosure requirement, paragraph (3)(a)'s failure to establish specific fine amounts for a violation related to the disclaimer and disclosures—as it does for untimely submitted forms—invites arbitrary enforcement, risking a high likelihood of unequal punishment for comparable conduct. For example, a 3PVRO associated with a particular political viewpoint, racial community, or religion could be assessed a large fine for failing to provide the disclaimer and disclosure, while a 3PVRO with political or religious views in closer

alignment with those of enforcing officials could receive a lesser fine for the same violation. Such potential arbitrary enforcement renders the statute too vague to give notice as to the penalties for violation.

118.   Paragraph (4) is equally vague; it simply provides that:

> If the Secretary of State reasonably believes that a person has committed a violation of this section, the secretary may refer the matter to the Attorney General for enforcement. The Attorney General may institute a civil action for a violation of this section or to prevent a violation of this section. An action for relief may include a permanent or temporary injunction, a restraining order, or any other appropriate order.

Fla Stat. § 97.0575(4). It does not identify what civil penalties the Attorney General may pursue or the range or maximum amount of such penalties. It does not specify the form of a restraining order, the terms of a possible injunction, or any criteria that would give Civic Engagement Plaintiffs notice of what would be an "appropriate" order. It does not specify whether or not such an injunction could result in revocation of Plaintiffs' 3PVRO status, which would in turn result in the inability of Civic Engagement Plaintiffs to conduct voter registration activities on behalf of their organizations.  Further, paragraph (4) does not specify whether the Attorney General may take action against individual volunteers for a "violation" under the law. Civic Engagement Plaintiffs do not want to put their volunteers at risk and would recruit fewer volunteers if they are subject to penalties, especially the first-time volunteers that the organizations work to engage.

119.    Paragraphs (3)(a) and (4) also fail to indicate whether they apply to voter registration activities conducted outside the State of Florida, where Plaintiffs may engage with eligible Florida voters.

120.    These ambiguities risk allowing the Attorney General to enforce the statute "on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Harris*, 564 F.3d at 1312 (quoting *Grayned v. City of Rockford*, 408 U.S. 104 (1972)). Section 97.0575(3)(a) and (4) therefore must fail as void for vagueness, in violation of the Fourteenth Amendment.

## COUNT II

### Compelled Speech
### Plaintiffs Harriet Tubman Freedom Fighters and HeadCount
### (Defendants' Lee and Moody's Violation of Plaintiffs' First Amendment Rights
### Pursuant to 42 U.S.C. § 1983)

121.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

122.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I.

123.    The First Amendment applies to the states through the Fourteenth Amendment. In the following paragraphs, references to the First Amendment

include the First Amendment as applied to the states through the Fourteenth Amendment.

124. "[F]reedom of speech includes both the right to speak freely and the right to refrain from speaking at all." *Janus v. Am. Fed. of State, Cnty., and Mun. Emps.*, 138 S. Ct. 2448, 2463 (2018) (citation omitted). Consequently, the government cannot compel individuals to speak. *Masterpiece Cakeshop Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1745 (2018).

125. In the same vein, "[b]ecause the government cannot compel speech, it also cannot 'require speakers to affirm in one breath that which they deny in the next.'" *Id.* (quoting *Pacific Gas & Elec. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 16 (1986)).

126. Laws "compelling individuals to speak a particular message . . . alte[r] the content of [their] speech.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (quoting *Riley v. Nat'l Fed'n of Blind of N. C., Inc.*, 487 U.S. 781, 795 (1988)). Content-based regulations of speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 2365 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

127. Voter registration activity is "the type of interactive communication concerning political change that is appropriately described as 'core political

speech.'" *Meyer*, 486 U.S. at 422–23; *see also Buckley v. Am. Const. Law Found.*, 525 U.S. 182, 186–87 (1999) (quoting *Meyer*, 486 U.S. at 422). Whether a voter should register and ultimately participate in an election is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking criminal sanctions." *Meyer*, 486 U.S. at 421.

128.   SB 90's disclaimer and disclosure provision requires Civic Engagement Plaintiffs to "notify the applicant at the time the application is collected that the organization might not deliver the application to the division or the supervisor of elections in the county in which the applicant resides in less than 14 days or before registration closes for the next ensuing election . . ." Fla. Stat. § 97.0575(3)(a). They also "must advise the applicant that he or she may deliver the application in person or by mail" and "inform the applicant how to register online with the division and how to determine whether the application has been delivered." *Id.* This "disclosure requirement" therefore constitutes a "government-drafted script" that alters the content of Civic Engagement Plaintiffs' speech. *Nat'l Inst. of Fam. & Life Advocs.*, 138 S. Ct. at 2371.

129.   The portion of the disclosure requirement requiring Civic Engagement Plaintiffs' agents to tell applicants that Civic Engagement Plaintiffs may fail to timely submit their completed voter registration forms is false. Section 97.0575(3)(a) requires that completed registration forms "be promptly delivered to the division or

the supervisor of elections in the county in which the applicant resides within 14 days after completed by the applicant." Fla. Stat. § 97.0575(3)(a). This provision, therefore, unconstitutionally forces Civic Engagement Plaintiffs to speak for the government, making disclaimers that they would not otherwise recite.

130.   Furthermore, Civic Engagement Plaintiffs make every effort to turn in applications on time in conjunction not only with Florida state law, but with their missions to increase voter participation and civic engagement. The disclaimer required by Section 97.0575(3)(a) requires Civic Engagement Plaintiffs to undermine their own work, message, and mission by requiring them to state that they "might not" turn in the application on time, especially when Civic Engagement Plaintiffs have every intention to submit the forms on time. Therefore, such a compelled declaration is at worst false and, at best, misleading.

131.   Such a disclaimer also falsely suggests that voters should *not* turn in applications to Civic Engagement Plaintiffs if they want to be sure they are registered to vote when, in fact, potential voters are less likely to timely submit voter registration forms on their own as compared to 3PVROs like Plaintiffs HTFF and HeadCount.  Civic Engagement Plaintiffs are further incentivized to timely submit the forms because their missions are dependent on building trust with applicants and creating a community of volunteers and civically engaged registered voters. This misleading statement undermines a voter's confidence that their voter registration

application form will result in a timely, valid registration. *See League of Women Voters of Tenn. v. Hargett*, 400 F. Supp. 3d 706, 714 (M.D. Tenn. 2019).

132.   This provision also hinders Civic Engagement Plaintiffs' efforts to develop relationships with registrants and will improperly diminish these Plaintiffs' credibility in the communities in which they work as they further engage in necessary follow-up assistance with voter registration or voting.

133.   In the same way, the disclaimer requirement also impermissibly induces Civic Engagement Plaintiffs to refute the information they must communicate, in order to reassure applicants that their voter registrations will be timely delivered, violating Civic Engagement Plaintiffs' right not to speak. *See Pacific Gas & Elec. v. Pub. Util. Comm'n of Cal.,* 475 U.S. at 11 (1986) (noting that "…the State is not free either to restrict appellant's speech to certain topics or views or to force appellant to respond to views that others may hold.").

134.   The mandatory disclaimer serves no legitimate governmental function or purpose, as there is no evidence that Floridians have been confused about the nature of community-based voter registration activity. There is no suggestion that Civic Engagement Plaintiffs or similar voter registration groups have regularly turned in late forms or that they would make anything other than their best efforts to timely submit forms. This is particularly true where there are already existing penalties for late-delivered forms. There is also no evidence that telling applicants

they can register online or submit their applications themselves produces *more* timely-registered voters. To the contrary, in Civic Engagement Plaintiffs' experience, this approach is likely to lead to *fewer* voters becoming registered.

135.   However, the mandatory disclaimer does serve to significantly impede Civic Engagement Plaintiffs' mission of connecting with new voters and those without Florida driver's licenses and printer access (who must print, sign, and submit their applications created online in order to register to vote) because in-person registration is more effective for reaching these prospective voters and field registration using paper forms is the most effective means of promoting voter registration at the events, festivals, and communities where Civic Engagement Plaintiffs operate.

136.   Additionally, in Civic Engagement Plaintiffs' experience, individuals who express interest in voter registration are far more likely to become registered and vote when the application is submitted on the applicant's behalf by a trusted organization with whom the prospective voter has had personal contact.

137.   With respect to the requirement that Civic Engagement Plaintiffs inform applicants of the methods by which they may submit their own voter registration applications, Florida (through its Secretary of State) already has the means to, and, in fact, does provide this information to applicants who use the Florida Voter Registration Application.  With respect to the requirement that voter

registration organizations inform applicants of how to determine "whether the application has been delivered," Florida's Secretary of State could—but has not—created a centralized lookup system for voter applicants to determine whether applications returned have been successfully received and entered into the statewide voter registration database by the supervisor; the Secretary could then include this lookup information on the registration form.  It also could—but fails to—notify applicants who submit their completed forms through a third-party organization that, under Florida law, the organization has 14 days to submit their forms to the appropriate supervisor's office and could—but does not—inform applicants how they can determine whether their completed registration form was received.[27] Florida, therefore, has the power to disseminate this information to applicants, without imposing a disclosure requirement on Civic Engagement Plaintiffs and similarly situated organizations. But they have instead chosen to impose these messages on Civic Engagement Plaintiffs.

138.   These mandated disclosures also require Civic Engagement Plaintiffs to speak to services provided by the Florida state government. Florida is thus co-opting these Plaintiffs to promote the state's online voter registration system despite the fact that the system cannot be used to fully register online if the applicant does

---

[27] See Florida Voter Registration Form (rev. 2013), *available at* https://files.floridados.gov/media/703485/dsde39-english-pre-7066-20200914.pdf

not have a Florida driver's license or state ID, *see* Fla. Stat. § 97.0525(4)(c), and that Florida already provides the website for the online registration system on its own state form.

139.   The Supreme Court has invalidated mandated disclosures that do not speak to the services provided by the non-government party, but by the government itself. *See Nat'l Inst. of Fam. & Life Advocs.*, 138 S. Ct. at 2372 ("The notice in no way relates to the services that licensed clinics provide. Instead, it requires these clinics to disclose information about *state*-sponsored services . . .". (emphasis in original)).

140.   In these ways, Section 97.0575(3)(a) directly and unjustifiably restricts Civic Engagement Plaintiffs' core political speech and expressive conduct in communicating their belief in the capacity of the popular will to shape the composition and direction of government. Advocating for that belief through their endeavors to assist others in registering to vote is itself a political statement.

141.   As a result of the new disclaimer requirements that SB 90 will needlessly and unjustifiably place on Civic Engagement Plaintiffs' voter registration activities, they will have to expend additional resources to conduct voter registration. But for these burdens imposed by SB 90, these resources could be spent on Civic Engagement Plaintiffs' other activities. In addition, these Plaintiffs believe their

voter registration efforts will be less effective and their missions will be frustrated because of the misleading disclosure requirements SB 90 imposes.

142.   To the extent the state government thinks that the message required by Section 97.0575(3)(a) is needed, the government must speak for itself. Defendants cannot co-opt the speech of Plaintiffs HTFF and HeadCount and other civic organizations' speech to further their own government message.

143.   For these reasons, Section 97.0575's mandated disclosures constitute compelled speech, in violation of the First Amendment.

## COUNT III

### Free Speech and Association
### Plaintiffs Harriet Tubman Freedom Fighters and HeadCount
### (Defendants' Lee and Moody's Violation of Plaintiffs' First Amendment Rights
### Pursuant to 42 U.S.C. § 1983)

144.   Plaintiffs repeat and reallege each and every allegation contained in preceding paragraphs as if fully set forth herein.

145.   Plaintiffs HTFF and HeadCount wish to exercise their rights to promote civic engagement and associate with potential voters. The "freedom to associate with others for the common advancement of political beliefs and ideas is a form of orderly group activity protected by the First and Fourteenth Amendments." *Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973) (internal quotations omitted).

146.   As a consequence of requiring Civic Engagement Plaintiffs to undermine their own credibility, effectiveness, and message, SB 90 directly restricts Civic Engagement Plaintiffs' core political speech and expressive conduct in communicating their belief in the capacity of the popular will to shape the composition and direction of the government. Advocating for that belief through their endeavors to assist others in registering to vote is in itself a political statement. Moreover, the Law implicates Civic Engagement Plaintiffs' associational rights in banding together to engage in voter registration activity and in assisting community members to join the civic community by registering to vote.

147.   Like the circulation of an initiative petition for signatures, voter registration activity is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 422; *see also Buckley*, 525 U.S. at 186–87 (quoting *Meyer*, 486 U.S. at 422). Whether a voter should register and ultimately participate in an election is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking criminal sanctions." *Meyer*, 486 U.S. at 421.

148.   Section 97.0575(3)(a) burdens Civic Engagement Plaintiffs' First Amendment rights by diminishing the value and nature of their expression through delegitimizing the content of their organizational message and their ability to communicate with their chosen audience. The disclaimer and disclosure provisions

impair Civic Engagement Plaintiffs' ability to associate, help citizens register to vote, and express their collective views.

149. The disclaimer and disclosure provision in SB 90 is an impermissible content-based restriction on speech because speakers who discuss voter registration are subject to restrictions that other speakers are not.

150. These requirements are not narrowly tailored to serve any compelling state interest. Indeed, these requirements do not actually advance any legitimate regulatory interest, and serve little purpose other than to make civic engagement activities more difficult and less successful, and dissuade individuals from engaging in voter registration activity and thereby associating with Civic Engagement Plaintiffs. Under the exacting scrutiny applied in *Meyer*, or any other level of judicial scrutiny, these requirements fail.

## COUNT IV

### Voting Assistance Ban
### Plaintiffs PVAF, PVACF, Kirk, and Resnick
### (All Defendants' Violation of Section 208 of the Voting Rights Act of 1965, 52 U.S.C. § 10508
### Pursuant to 42 U.S.C. § 1983)

151. Plaintiffs repeat and reallege each and every allegation contained in preceding paragraphs as if fully set forth herein.

152. Section 208 of the VRA, 52 U.S.C. § 10508, provides: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or

write may be given assistance by a person of the voter's choice, other than the voter's

employer or agent of that employer or officer or agent of the voter's union."

153.   The word "vote" is expressly defined in 52 U.S.C. § 10310(c)(1) as

follows:

> The terms "vote" or "voting" shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.

*OCA-Greater Houston v. Texas,* 867 F.3d 604, 614-15 (5th Cir. 2017) (quoting 52

U.S.C. § 10310(c)(1)) ("'To vote,' therefore, plainly contemplates more than the

mechanical act of filling out the ballot sheet.").

154.   Under Section 208, a voter who is blind, disabled, or unable to read or

write possesses the right to choose *any* person other than their employer or union

representative—regardless of whether the person is a near relative or legal

guardian—to assist them with the voting process, including the steps necessary to

obtain, cast, and submit an absentee ballot. *See* 52 U.S.C. § 10508; *OCA-Greater

Houston*, 867 F.3d at 614–15.

155.   Fla. Stat. Section 104.0616 limits voters to receiving assistance in

receiving and returning their ballot only from either an immediate family member,

as defined in the statute, or an individual who has not handled the mail ballot of more

than one other voter who is not an immediate family member. This provision is therefore in direct conflict with the Voting Rights Act as it concerns Section 208-covered voters.

156.   Plaintiff Kirk is President of PVACF and a registered Florida voter who would like to vote by mail in future elections with the assistance of his hired caregiver. He is quadriplegic, but under the new restriction imposed by Section 104.0616, if his caregiver assists more than one other person who is not an immediate family member with marking and/or submitting a mail ballot in any given election, she cannot help him return his mail ballot in that election.

157.   Plaintiff Resnick is a registered Florida voter who has voted by mail since 2012 and plans to vote by mail in future elections. She does not want to participate in supervised voting. Currently, she lives in her CCRC's care center and must receive help from staff members in obtaining and sending mail. She does not know when she will be allowed to return to the CCRC's independent living center.

158.   The PVA Plaintiffs' members have varying degrees of disabilities that impact their mobility and ability to independently carry out their daily routines. Many are registered Florida voters, cast their ballots by mail, and require assistance in requesting, marking, and returning their ballots. Some members do not have immediate family members who can assist them in the voting process or do not wish to be assisted by a family member. Some members also wish to choose as their

assistant individuals such as a social worker or caregiver whose assistance is likely to be needed by more than one other individual. Furthermore, some do not live in a facility where supervised voting is available, or do not wish to vote through the supervised voting program. Section 104.0616 impermissibly limits whom the PVA Plaintiffs' members may ask for assistance in receiving, marking, and/or returning their completed ballots to election officials.

159. By depriving Individual Plaintiffs and the PVA Plaintiffs' members of rights and privileges under Section 208 of the VRA under the color of state law, Defendant Lee has violated and is liable under 42 U.S.C. § 1983.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

A.    Assume jurisdiction over this matter;

B.    Declare that the disclaimer and disclosure requirements in Fla. Stat. § 97.0575(3)(a) violate the First and Fourteenth Amendments of the United States Constitution;

C.    Declare that Fla. Stat. § 97.0575(3)(a) is void for vagueness, in violation of the Fourteenth Amendment of the United States Constitution;

D.    Declare that Fla. Stat. § 104.0616 violates Section 208 of the Voting Rights Act, 52 U.S.C. § 10508;

E.      Preliminarily and permanently enjoin Defendants from enforcing the disclaimer and disclosure requirements in Fla. Stat. § 97.0575(3)(a);

F.      Preliminarily and permanently enjoin Defendants from administering and enforcing Fla. Stat. § 104.0616 as to voters covered by Section 208 of the Voting Rights Act, 52 U.S.C. § 10508;

G.      Permanently enjoin Defendants from violating the Section 208-covered Plaintiffs' federal statutory rights with respect to any election in the state;

H.      Order Defendants to implement measures to ensure Section 208-covered Florida voters are able to vote by mail by permitting voters who, by reason of blindness, disability, or an inability to read or write, require assistance to receive the mail ballot, mark and complete a mail ballot, and/or submit a mail ballot, to obtain assistance from anyone who is not their employer or union representative;

I.      Order Defendants to implement a remedial plan to educate Section 208-covered voters regarding their right to assistance in voting by mail;

J.      Retain jurisdiction to render any and all further orders that this Court may deem necessary;

K.      Award Plaintiffs their attorneys' costs and fees pursuant to statute; and

L.      Grant any and all other relief this Court deems just and proper.

Dated:      July 15, 2021               Respectfully submitted,

                                         */s/ Nancy G. Abudu*
                                         Nancy G. Abudu (Fla. Bar No. 111881)
                                         Emma C. Bellamy
                                         Southern Poverty Law Center
                                         P.O. Box 1287
                                         Decatur, Ga 30031-1287
                                         Tel: 404-521-6700
                                         Fax: 404-221-5857
                                         nancy.abudu@splcenter.org
                                         emma.bellamy@splcenter.org

                                         Michelle Kanter Cohen
                                         Jon Sherman*
                                         Cecilia Aguilera
                                         Fair Elections Center
                                         1825 K Street NW, Suite 450
                                         Washington, DC 20006
                                         Tel.: (202) 331-0114
                                         mkantercohen@fairelectionscenter.org
                                         jsherman@fairelectionscenter.org
                                         caguilera@fairelectionscenter.org

                                         *Attorneys for Plaintiffs*
                                         *application for admission *pro hac vice*
                                         forthcoming